## PEOPLE v. PRILLEN.

(Supreme Court, Appellate Division, First Department. June 6, 1902.)

1. CITY OF NEW YORK—JURISDICTION—EAST RIVER.

Consolidation Act (Laws 1882, c. 410) § 1, made the city and county of New York include all the rivers and harbors to low-water mark on the opposite shores. The new charter of 1897 (section 1) provides that all the municipal and public corporations within the "following territory": the county of Kings, Richmond, city of Long Island, towns of Newton, Flushing. Jamaica, and the former town of Hempstead, etc., are consolidated with the corporation known as the mayor, aldermen, and commonalty of the city of New York, to be hereafter called the "City of New York," and the boundaries and jurisdiction are declared "coextensive with the territory above described." Section 2 divides the

city into boroughs, the land under the water of the East river not being
included in either borough; and section 3 gives the city of New York all
the power held by the mayor, aldermen, and commonalty of the city of
New York. Section 4 provides the local government in the territory
described shall be exercised by the city of New York. Section 8 provides
that all the rights, title, and interest of the various corporations de-
scribed are vested in the city of New York. Section 864 makes the port
of New York include the waters of the East river. *Held*, that it was the
intent to include in the new city all the territory formerly included
within the corporation known as the "Mayor, Aldermen, and Commonalty
of the City of New York," and the various corporations consolidated
with it, and that section 864, being part of the charter relating to ports
and waters, was not intended to limit the jurisdiction of the city, and
its jurisdiction extended over all the waters of the East river from low-
water mark to the opposite shore; and one acting as engineer for a
boiler on a scow in the East river, and not having a certificate of
qualification, required by section 343, could be prosecuted under the stat-
ute.

2. BURDEN ON COMMERCE.

New York City Charter, § 343, makes it a misdemeanor for one to
act as engineer for the purpose of operating a steam boiler, save for
private dwellings for heating purposes or for locomotives, without a
certificate of qualification. *Held* that, though applicable to one acting as
engineer of a boiler situated on a scow on the East river, and used for
blasting purposes, the statute did not impose a burden on commerce.

Appeal from court of special sessions of city of New York.

August Prillen was convicted of a violation of section 343 of the
New York City charter, and he appeals. Affirmed.

Argued before VAN BRUNT, P. J., and HATCH, PATTER-
SON, INGRAHAM, and LAUGHLIN, JJ.

Edward Grenville Benedict, for appellant.

Robert C. Taylor, for the People.

INGRAHAM, J. It appeared from the evidence that the defend-
ant was employed by a corporation, a contractor acting under a con-
tract with the United States government in removing a ledge of rocks
in the East river. In the performance of this contract the contractor
had two scows that were anchored over the ledge of rocks, and upon
each of these scows there was a boiler used to supply steam to the
steam drills. These boilers were in charge of a licensed engineer,
and the defendant was a fireman, who had charge of the boilers in
the absence of the engineer. The defendant had no certificate from
the police department of the city of New York, as required by sec-
tion 343 of the charter. At the time of the defendant's arrest he
was in charge of the boiler upon one of the scows, in the absence
of the engineer, there being no other fireman present. It was proved
that the defendant was in charge of this particular boiler at the time;
that he attended to the fire, kept up the steam, and was generally
engaged in operating this particular steam boiler which was then in
use to generate steam for the work. Section 343 of the charter of
the city of New York provides that "it shall not be lawful for any
person or persons to operate or use any steam boiler to generate
steam except for railway locomotive engines, and for heating pur-
poses in private dwellings, and boilers carrying not over ten pounds

of steam and not over ten horse power, or to act as engineer for such purposes in the city of New York without having a certificate of qualification therefor," and a violation of this section of the charter is made a misdemeanor. The vessel upon which the boiler in question was located had no motive power, and was not used for the purpose of navigation. It was used in the performance of the contract with the government by the defendant's employers in removing this ledge of rock in the East river. Neither the engineer in charge of the work nor the defendant had a license from the United States government, nor is a United States license required to run a stationary plant anchored in a navigable stream. No question is therefore presented as to the right of the city of New York to require a license from persons operating boilers upon vessels engaged in navigation when the engineers and firemen so engaged are licensed under the laws of the United States. We have here a stationary boiler, used for a purpose entirely distinct from navigation, and over which the government of the United States has asserted no control. I can see no difference between this case and a case where the boiler was placed upon the shore, and steam carried to the work by pipes. The contractors, while engaged in this work, were subject to the police regulations provided by the state for the protection of the community. If this boiler had been, as before suggested, upon the upland, and the steam had been carried to the drills by pipes, I suppose there would be no dispute but that the police regulations for the use of such boilers would be binding upon the contractors; and I can see no distinction between such a case and the case where the boilers themselves were upon scows floating upon the water and anchored over the reef to be removed. The defendant, however, claims that under the charter the waters of the East river are not included within the city of New York. Prior to the enactment of the new charter it is conceded that the East river at the locality in question was a part of the city and county of New York. By section 1 of the consolidation act (chapter 410 of the Laws of 1882) it is provided that "the city and county of New York shall contain * * *, together with all the land under water within the following bounds," and there was included all the land from the low-water mark on Long Island to the west bounds of the state, which would be to the low-water mark on the west side of the Hudson river. Thus the city and county of New York includes the whole of the rivers and harbors to actual low-water mark on the opposite shores. Stryker v. City of New York, 19 Johns. 179; Atlantic Dock Co. v. City of Brooklyn, *42 N. Y. 444; Orr v. City of Brooklyn, 36 N. Y. 661. By section 1 of the charter it is provided that:

"All the municipal and public corporations and parts of municipal and public corporations, including cities, villages, towns and school districts, but not including counties, within the following territory, * * * are hereby annexed to, united and consolidated with the municipal corporation known as the mayor, aldermen and commonalty of the city of New York to be hereafter called 'The City of New York' and the boundaries, jurisdiction and powers of the said city of New York herein constituted, are for all purposes of local administration and government hereby declared to be co-extensive with the territory above described."

Here all the municipal corporations within the specified territory were "annexed to, united, and consolidated with" the municipal corporation theretofore known as the mayor, aldermen, and commonalty of the city of New York and was to constitute the new city of New York. When those outlying territories were consolidated with an existing city, and the consolidated district organized into a new city, it would follow that the new city thus created included the municipality formerly known as the mayor, aldermen, and commonalty of the city of New York with the localities thereto added. Adopting the construction of this section urged by the defendant, the new city of New York would not include any portion of Manhattan Island, or any portion of the territory which formerly constituted the municipal corporation known as the mayor, aldermen, and commonalty of the city of New York. Section 2 of the charter divides the city of New York into five boroughs, and the land under water in the East, Harlem, and Hudson rivers does not seem to have been included in either of these boroughs; but as this division into boroughs was for purely administrative purposes, and as from the necessity of the situation the land under water in these rivers would not be subject to the administrative control for which the boroughs were provided, it might well be that it was not considered proper to include the rivers or the New York harbors within the boundaries of either of the boroughs, leaving the control of such waters and the land under water to the authorities of the whole city. There is nothing, however, in this section which bounds the different boroughs to override the express provision of the first section, which consolidated several municipal and public corporations into one corporation, constituted for all "purposes of local administration and government hereby declared to be coextensive with the territory above described," which included the territory which had, prior to the adoption of the act, been included within the boundaries of the municipal corporation known as the mayor, aldermen, and commonalty of the city of New York, and this conclusion is confirmed by subsequent sections of the charter. Section 3 provides that the name of the corporation constituted by "this act shall be the city of New York, * * * with all of the rights, properties, interests, claims, demands, grants, powers, privileges and jurisdictions, held by the mayor, aldermen and commonalty of the city of New York, and held by each of the municipal and public corporations or parts thereof other than counties by this act united and consolidated with the corporation known as the mayor, aldermen and commonalty of the city of New York"; and section 4 provides that "for all purposes the local administration and government of the people and property within the territory hereby comprised within the city of New York shall be in and be exercised by the corporation aforesaid"; and section 8 provides that, "to carry out the scheme and purpose of this act, all of the public buildings, institutions, public parks, water works, and property of every character and description, whether of a public or private nature, heretofore owned and controlled by any of the said municipal and public corporations or parts thereof, hereby consoli-

dated into the city of New York, including any and all such prop-
erty owned by the county of New York, the county of Kings and
the county of Richmond, wherever situated, and by the county of
Queens situated in that portion thereof which is included within
the limits of the city of New York, as constituted by this act, and
all the rights, title and interest of the said municipal and public
corporations and counties as aforesaid, are hereby vested in the
city of New York." These provisions, taken together, clearly show
a legislative intent to include within the boundaries of the new city
all of the territory which was included within the municipal cor-
poration known as the mayor, aldermen, and commonalty of the
city of New York, and to give to the new city the same jurisdic-
tion and control over all of the said territory that was before exer-
cised by the various municipal corporations that were consolidated
to form the new city. Section 864 of the charter is a re-enactment
of section 803 of the consolidation act, and was not intended to
make a distinction between the port of New York and the territories
over which the city had jurisdiction. That section is a part of
chapter 16 of the charter, which relates specifically to docks, piers,
harbors, ports, and waters, and gives to the department of docks
and ferries jurisdiction over all the water front, wharf properties,
lands under water, wharves, piers, bulkheads, and structures thereon
situated within the city of New York as constituted by the charter.
This chapter contains many provisions regulating commerce within
the port of New York, and the provision is that the port of New
York, whenever the same "is mentioned or referred to in this chap-
ter, shall be deemed and taken to include, unless otherwise ex-
pressly stated, all the waters of the North river and East river,
and the harbor embraced within or adjacent to or opposite to the
shores of the city of New York, as constituted by this act"; the
object clearly being to extend the limits of the port of New York
so as to include all the waters adjacent to any of the territory in-
cluded within the city, not to restrict the jurisdiction of the city
of New York over all of the territories which were included to
form the new city. Its provisions were confined to the chapter
which regulated the commerce of the port. It would, therefore,
seem to follow that the jurisdiction of the city of New York for
all purposes of municipal control and for the regulation of the police
power extended over all of the North river and the East river from
the low-water mark to the opposite shores, and, this being so, the
provision of section 343 of the charter applied.

The learned counsel for the defendant also claims that this regu-
lation, if applied to a boiler upon a scow such as the one in ques-
tion, would be a burden upon commerce, and therefore should not
be included within the provision of this section; but we think it
clear that extending the operation of this section to a boiler such
as the one in question would have no possible relation to commerce,
or vessels engaged in navigation. This scow in question was not
engaged in commercial business, and the boiler in use and which
was operated by the defendant had no relation to commerce. It
was a stationary boiler for the purpose of generating steam to be-

used in a blasting operation. It had no more relation to commerce than any boiler upon land used for the same purpose, and whether it was located upon the upland, upon one of the docks or piers of the city, or upon a scow anchored in the stream, it was a stationary boiler, used in the performance of the work of blasting, and not in any commercial work. The requirements as to engineers and firemen upon vessels engaged in commerce or navigation are regulated by the laws of the United States, and over such engineers or firemen the state of New York has attempted to exercise no control. This regulation in question is clearly intended as an exercise of the police power to apply to those in charge of steam boilers or steam engines within the city of New York, where the same are used for the ordinary purposes over which a municipal corporation has control. It has such control over boilers used for generating steam for blasting purposes, and we think it was clearly intended to bring a boiler used, either upon land or water, within the territorial limits of New York, when used for this purpose, within the provisions of this section. .

It follows that the judgment appealed from should be affirmed, with costs. All concur.