UNIVERSITY OF TEXAS SOUTH-
WESTERN MEDICAL CENTER
AT DALLAS, Petitioner,

v.

The ESTATE OF Irene Esther ARANCI-
BIA by its Beneficiary Victor Hugo
VASQUEZ–ARANCIBIA, Victor Hugo
Vasquez–Arancibia, Individually, and
Cecilia Vasquez–Arancibia, Individu-
ally, Respondents.

No. 08–0215.

Supreme Court of Texas.

Argued Sept. 10, 2009.

Decided Oct. 22, 2010.

Attorney General Greg W. Abbott, Attorney General of Texas, Kent C. Sullivan, David S. Morales, Office of the Attorney General of Texas, Deputy First Assistant Attorney General, Nelly R. Herrera, Office of the Attorney General, John P. Giberson, Assistant Attorney General, Tort Litigation Division, Elsa Giron Nava, Office of the Attorney General, James C. Ho, Solicitor General of Texas, Daniel L. Geyser, Asst. Solicitor General, Office of the Attorney General of Texas, Clarence Andrew Weber, First Assistant Attorney General, Austin, TX, for Petitioner.

Stephen A. Khoury, Lance Eric Caughfield, Kelsoe Anderson Khoury & Clark, Dallas, TX, for Respondent.

Todd K. Sellars, Dallas County Asst. Atty., Dallas, for Amicus Curiae.

Chief Justice JEFFERSON delivered the opinion of the Court, joined by Justice HECHT, Justice MEDINA, Justice GREEN, Justice WILLETT, Justice GUZMAN, and Justice LEHRMANN.

This appeal turns not on the merits of the underlying claim but on whether prerequisites to suit have been satisfied, and if not, whether an interlocutory appeal is available. Because the relevant requirements were met here, and because interlocutory appeal was appropriate, we affirm the court of appeals' judgment.

## I. Background

Irene Arancibia underwent laparoscopic hernia surgery at Parkland Memorial Hospital on September 4, 2003. The procedure was performed by two resident physicians, Drs. Curtis and Yau, and attended by Dr. Watson, an assistant professor of surgery in the gastrointestinal/endocrine division, Department of Surgery, at U.T. Southwestern in Dallas. Arancibia was discharged later that day. Two days later, she presented to Parkland's emergency room with severe abdominal pain. Emergency surgery revealed that, during the hernia repair, her bowel had been perforated in two places, leading to acute peritonitis with sepsis. She died the following day.

Her family initially sued the operating physicians but later nonsuited them, naming Southwestern and Parkland in their stead. Southwestern moved to dismiss the case, contending that the trial court lacked jurisdiction because the Arancibias failed to provide timely notice of their claim. The trial court denied the plea, and the court of appeals affirmed. 244 S.W.3d 455, 462. We granted the petition for review,

52 Tex. Sup.Ct. J. 910, 911 (June 26, 2009), and now affirm.

## II. The 2005 amendment to Government Code section 311.034 applies.

Absent a waiver, governmental entities, like Southwestern, are generally immune from suits for damages. *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 374 (Tex.2006). The Texas Tort Claims act waives immunity from suit "to the extent of liability created by [the Act]." TEX. CIV. PRAC. & REM.CODE § 101.025(a). To take advantage of this waiver, the plaintiffs must notify the government of a claim within six months. *Id.* § 101.101(a). The notice must reasonably describe the injury, the time and place of the incident, and the incident itself. *Id.* But this formality is not required "if the governmental unit has actual notice that death has occurred [or] that the claimant has received some injury." *Id.* § 101.101(c).

In 2004, we concluded that the notice requirements were mandatory, rather than jurisdictional, and that there was no interlocutory appellate jurisdiction over an order that denied a governmental unit's jurisdictional plea based on a claimant's failure to provide notice. *See Univ. of Tex. Sw. Med. Ctr. v. Loutzenhiser*, 140 S.W.3d 351, 365–66 (Tex.2004). Shortly thereafter, the Legislature amended the Government Code to provide that "[s]tatutory prerequisites to a suit, including the provision of notice, are jurisdictional requirements in all suits against a governmental entity." TEX. GOV'T CODE § 311.034. The 2005 amendment did not change those statutory prerequisites; it merely stated the consequence of a failure to comply with them. The amendment took effect September 1, 2005. Act of May 25, 2005, 79th Leg., R.S., ch. 1150, § 2, 2005 Tex. Gen. Laws 3783, 3783.

Southwestern then filed a plea to the jurisdiction, contending that it had no pre-suit notice (formal or actual) of the Aranci-bias' claim. The court of appeals did not reach this issue, because it held that this case, filed years before the 2005 amendment, was not governed by its terms—an issue that has led to considerable disagreement among our courts of appeals (including a split between Houston's First and Fourteenth Districts).[1]

■ If the amendment applies, a lack of notice would be jurisdictional, meaning that the trial court could dispose of the case on a plea to the jurisdiction, and a governmental unit would have a statutory right of interlocutory appeal if the plea failed. TEX. CIV. PRAC. & REM.CODE § 51.014(a)(8); *Loutzenhiser,* 140 S.W.3d at 359. If the requirement is merely mandatory, a governmental unit would be entitled to summary judgment, but the trial court's denial of that motion could not be immediately appealed, and the governmental unit could waive the issue. *Loutzenhiser,* 140 S.W.3d at 359.

The Legislature did not state whether the amendment applied prospectively or retroactively, nor did the act contain a savings clause for pending suits. The amendment merely provided that it "takes effect September 1, 2005." Act of May 25, 2005, 79th Leg., R.S., ch. 1150, § 2, 2005 Tex. Gen. Laws 3783, 3783. We presume the statute is prospective unless expressly made retrospective. *See* TEX. GOV'T CODE § 311.022.

■ But the prospectivity presumption does not necessarily answer whether the amendment governs this suit. Another rule provides that a court is to apply the law in effect at the time it decides the case. *See Bradley v. Sch. Bd. of the City of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974); *Tex. Mun. Power Agency v. Public Util. Comm'n of Tex.,* 253 S.W.3d 184, 198 (Tex.2007) (explaining that jurisdictional statutes should be applied as they exist at the time judgment is rendered); *see also Landgraf v. USI Film Prods.,* 511 U.S. 244, 264, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (noting the "apparent tension" between these two maxims). On closer examination, however, these two rules can be reconciled. *See Landgraf,* 511 U.S. at 273, 114 S.Ct. 1483 (noting that "[e]ven absent specific legislative authorization, application of new statutes passed after the events in suit is unquestionably proper in many situations"). A statute does not operate retroactively merely because it is applied in a

---

1. 244 S.W.3d at 459 (holding that amendment was "not retroactive"); *compare Howard v. Harrell,* No. 07–08–0013–CV, 2009 WL 839048, *3–4, 2009 Tex.App. LEXIS 2322, *10–11 (Tex. App–Amarillo Mar. 31, 2009, no pet.) (amendments to section 311.034 do not apply to case filed before statute enacted), *and Dallas Cty. v. Posey,* 239 S.W.3d 336, 339 (Tex.App.-Dallas 2007) (same), *vacated on other grounds, Dallas Cty. v. Posey,* 290 S.W.3d 869, 872 n. 1 (Tex.2009) (per curiam), *and Tex. Tech Univ. Health Sci. Ctr. v. Lucero,* 234 S.W.3d 158, 166 (Tex.App.-El Paso 2007, pet. denied) (same), *and Baylor Coll. of Med. v. Hernandez,* 208 S.W.3d 4, 8 (Tex.App.-Houston [14th Dist.] 2006, pet. denied) (same) *with Tex. Dep't of Criminal Justice v. Thomas,* 263 S.W.3d 212, 218 (Tex. App.-Houston [1st Dist.] 2007, pet. denied) (amendment applies to case filed before enactment), *and Med. Arts Hosp. v. Robison,* 216 S.W.3d 38, 41 (Tex. App.-Eastland 2006, no pet.) (same), *and Tex. Dep't of Criminal Justice v. Simons,* 197 S.W.3d 904, 906–07 (Tex.App.-Beaumont 2006, no pet.)(same); *see also* Hon. Scott Brister, *Is It Time To Reform Our Courts of Appeals?,* 40 HOUS. LAW. 22, 25 (Mar./Apr. 2003) (noting that "conflicting interpretations of the law are especially acute in Houston, due both to the volume of litigation in Harris County and the larger uncertainty as to who will hear the appeal"). This conflict gives us jurisdiction over this interlocutory appeal. TEX. GOV'T CODE § 22.225(c), (e).

case arising from conduct predating the enactment. *Id.* at 269, 114 S.Ct. 1483.

▆▆▆ The prohibition against retroactive application of laws does not apply to procedural, remedial, or jurisdictional statutes, because such statutes typically do not affect a vested right. *Tex. Mun. Power Agency*, 253 S.W.3d at 198. Because application of a new jurisdictional rule generally takes away no substantive right but simply impacts a tribunal's power to hear the case, present law normally governs in such situations. *Landgraf*, 511 U.S. at 273, 114 S.Ct. 1483 ("When the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive."). Thus, the Supreme Court of the United States has "regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed." *Id.* at 274, 114 S.Ct. 1483. Statutes—like section 311.034—that do not deprive the parties of a substantive right and "speak to the power of the court rather than to the rights or obligations of the parties" may be applied to cases pending at the time of enactment. *Id.* at 274–75, 114 S.Ct. 1483 (noting that "[c]hanges in procedural rules may often be applied in suits arising before their enactment without raising concerns about retroactivity") (citations omitted). We agree that it is appropriate to do so here, and such a construction is not retroactive. *See Quick v. City of Austin*, 7 S.W.3d 109, 132 (Tex. 1999).

Because the amendment applies, the purported failure to provide notice would deprive the trial court of jurisdiction, an issue that may be raised on interlocutory appeal. We now turn to Southwestern's contention that it lacked actual notice under the Act.

## III. Southwestern had actual notice under Government Code section 101.101(c).

▆▆▆ The Tort Claims Act states that formal notice is not required "if the governmental unit has actual notice that death has occurred, that the claimant has received some injury, or that the claimant's property has been damaged." TEX. CIV. PRAC. & REM.CODE § 101.101(c). But we have rejected an interpretation of actual notice that would "require[ ] *only* that a governmental unit have knowledge of a death, an injury, or property damage," because a defendant, like a hospital, would then have "to investigate the standard of care provided to each and every patient that received treatment," eviscerating the notice requirement's purpose. *See Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex.1995) (emphasis added). Instead, we held that the governmental unit had to know of its "alleged fault producing or contributing to the death, injury, or property damage." [2] *Id.* This standard led to some confusion among our courts of appeals,[3] and we explained it further in *Texas Department of Criminal Justice v. Simons*, 140 S.W.3d 338 (Tex.2004):

> What we intended in *Cathey* by the second requirement for actual notice was that a governmental unit have knowledge that amounts to the same notice to

---

**2.** We also held that actual notice required that the governmental unit know of the death, injury, or damages claimed, as well as the identity of the parties involved. *Cathey v. Booth*, 900 S.W.2d at 341. Southwestern does not dispute that it had notice of those matters in this case.

**3.** *See Tex. Dep't of Criminal Justice v. Simons*, 140 S.W.3d 338, 345–48 (Tex.2004) (collecting cases).

which it is entitled by section 101.101(a). That includes subjective awareness of its fault, as ultimately alleged by the claimant, in producing or contributing to the claimed injury.

*Simons,* 140 S.W.3d at 347. We observed that, if a governmental unit had this awareness of fault, along with the other information to which it was entitled under section 101.101(a), then requiring formal, written notice in addition would do nothing to further the statutory purposes of information gathering, settling claims, and preparing for trial.[4] *Id.*

We must, then, decide whether this record demonstrates Southwestern's subjective awareness of its fault, as ultimately alleged by the Arancibias, in producing or contributing to Arancibia's death. Although we have said that actual notice may be a fact question when the evidence is disputed, *id.* at 348, the pertinent facts here are uncontested. Dr. Watson was present during Arancibia's laparoscopic hernia repair. The day after her death, Watson emailed his immediate supervisor, who was chief of the division. The email begins, "I wanted to give you a heads up on a terrible outcome with a Surgery A patient." Watson described the surgery, which he believed went well, and Arancibia's return to the emergency room two days later. A laparotomy at that time "showed an unrecognized bowel injury," and Arancibia died the next day of multiple organ failure. Watson's email concluded, "I have already spoken with risk mgt."

Watson's supervisor responded, thanking Watson for the notification and men-tioning that he would forward the email to the Chair of the Department of Surgery. The Chair responded and discussed several of the reasons patients might present with symptoms more than twenty-four hours after surgery. His email began, "I heard about this today."

Dr. Watson surmised that the bowel perforation "was a result of a retraction injury out of the field of view." He stated that, in Arancibia's subsequent surgery, the physician observed a "through and through hole in the jejunum."[5] This was confirmed by the surgery records, which showed two perforations in the jejunum.

Shortly thereafter, upon reviewing Arancibia's treatment, Watson's supervisor concluded that "[a] technical error occurred during the original hernia operation resulting in a through-and-through small bowel injury" and that "[c]linical management contributed to" Arancibia's death. He stated that "[a]lthough unfortunate, this is a recognized complication of laparoscopic hernia surgery. No standard of care issues were identified upon review."

We conclude that this record shows that Southwestern was subjectively aware of its fault, as ultimately alleged by the Arancibias, in producing or contributing to Arancibia's death. Although Dr. Watson's supervisor determined that there were no standard of care violations, he noted that a "technical error" was made, that clinical management contributed to Arancibia's death, and that the care "was not necessarily consistent with established standards." His ultimate conclusion that those

---

4. We did not decide whether the TDCJ had actual notice of Simons's claim because, in a case decided the same day as *Simons,* we held that a claimant's failure to provide notice did not deprive the trial court of jurisdiction. *See Simons,* 140 S.W.3d at 348–49 (citing *Univ. of Tex. Sw. Med. Ctr. v. Loutzenhiser,* 140 S.W.3d 351 (Tex.2004)).

5. The jejunum is "the first two fifths of the small intestine beyond the duodenum usu. merging almost imperceptibly with the ileum though somewhat larger, thicker-walled, and more vascular and having more numerous circular folds and fewer Peyer's patches." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1213 (2002).

errors were acceptable does not detract from his subjective awareness that medical error contributed to Arancibia's death. It is true that, although Watson said he had contacted risk management, there was no evidence of why he did so or what he reported. But Watson and his superiors knew that Arancibia had died of multiple organ failure caused by sepsis, that her jejunum had been perforated in two places (an injury that Watson surmised probably occurred when surgical tools were being retracted), and that risk management had been alerted. *Simons,* 140 S.W.3d at 348 (noting that subjective awareness will often be proved, "if at all, by circumstantial evidence").

■ Fault, as it pertains to actual notice, is not synonymous with liability; rather, it implies responsibility for the injury claimed. Thus, we have held that a police report showing that barricades were missing was not evidence of a governmental unit's subjective awareness of its fault after an accident, because "a private contractor or another governmental entity (such as the county or state) could have been responsible for the [missing barricades]." *City of Dallas v. Carbajal,* 53 Tex. Sup.Ct. J. 715, 716 (May 7, 2010) (per curiam). But that cannot be the case when the sole instrumentality of harm is the government itself. Here, the government has conceded that its surgical error perforated Arancibia's intestine, resulting in sepsis, multiple organ failure, and death. A jury may absolve the government of liability for that death for any number of reasons. But a government cannot evade the determination by subjectively refuting fault. We cannot conclude that Southwestern was unaware of its fault in producing or contributing to the injury alleged.

■ Under the dissent's approach, only an unqualified confession of fault would provide actual notice of the incident. The dissent would conclude that because Southwestern's internal investigation found no breach of the standard of care, Southwestern could not have been aware of its fault in producing or contributing to Arancibia's death. But "fault" as required under *Simons* is not fault as defined by *the defendant,* but rather "as ultimately alleged by *the claimant." Simons,* 140 S.W.3d at 347 (emphasis added). Here, the Arancibias alleged that physician error led to Arancibia's perforated intestine and, ultimately, her death. That Southwestern was aware that its surgeons' errors caused those perforations and that clinical management contributed to her death is undisputed.

■ The purpose of the notice requirement is "to enable governmental units to gather information necessary to guard against unfounded claims, settle claims, and prepare for trial." *Cathey,* 900 S.W.2d at 341. The notice here satisfied that requirement; "requiring formal, written notice in addition would do nothing to further the purpose of the statute." *Simons,* 140 S.W.3d at 347. Indeed, such notice would state exactly what Southwestern already knew. And while a bad result, in and of itself, is not evidence of a breach of the standard of care, the proof of actual notice in this case went beyond the mere fact of Arancibia's death. Viewing the evidence in the light most favorable to the Arancibias, as we must,[6] Southwestern had actual notice as required by section 101.101(c).

**IV. We need not reach the question of whether a party may raise on interlocutory appeal an issue of sovereign immunity that it failed to raise in the trial court.**

■ Even assuming that it had the requisite notice, Southwestern contends

6. *See Tex. Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 228 (Tex.2004).

that the Arancibias did not substitute it as a party within thirty days of Dr. Watson's motion to dismiss under Tort Claims Act section 101.106. *See* TEX. CIV. PRAC. & REM.CODE § 101.106(f). Because Southwestern failed to raise this argument in the trial court, the court of appeals refused to consider the issue on interlocutory appeal. 244 S.W.3d at 461. Southwestern challenges this conclusion and argues that because we have held that immunity implicates subject matter jurisdiction, we may reach on interlocutory appeal issues the parties failed to raise in the trial court. The Arancibias disagree, contending that immunity is different from standing, ripeness, or other matters involving subject matter jurisdiction, and interlocutory appeal is different from final judgment.

We need not resolve this issue today. The 101.106 argument fails as a matter of law even if Southwestern could raise the issue for the first time on interlocutory appeal.

## V. Dr. Watson's answer was not a 101.106 motion.

■ Section 101.106(f) requires that "[o]n the employee's motion, the suit against the employee shall be dismissed" unless amended pleadings naming the governmental unit as a defendant are filed within thirty days. TEX. CIV. PRAC. & REM. CODE § 101.106(f). Dr. Watson moved to dismiss the case against him on January 20, 2005. Eight days later, the Arancibias filed their amended petition naming Southwestern as a defendant.

Southwestern argues that the Arancibias failed to meet the thirty-day deadline because the last sentence of Dr. Watson's answer (and his prayer), filed months earlier, mentioned 101.106 and prayed for dis-

missal. Southwestern urges us to treat Watson's general denial as if it were a 101.106 motion, triggering the thirty-day amended pleading deadline.

We conclude that Southwestern's general denial was not a 101.106(f) motion. Section 101.106(f) lists several prerequisites that must be satisfied before an employee is entitled to dismissal. The employee must show that the suit was filed against him based on conduct within the general scope of his employment and that it could have been brought under chapter 101 against the governmental unit only. *See id.* Watson's motion attached an affidavit stating he was acting within the scope of his employment with Southwestern; his answer did not.

Watson's motion incorporated portions of Arancibia's petition and argued that the claims she alleged were ones that could have been brought against Southwestern in the first instance; his answer did not.

Watson's motion was entitled "Motion to Dismiss Pursuant to TCPRC Section 101.106"; his answer was not.[7]

The motion attached a blank fiat setting the matter for hearing; the answer did not.

The parties' Rule 11 agreement stated that Dr. Watson would not file a 101.106(f) motion before January 31, 2005 (long after he had filed his answer). While that agreement has no bearing on whether the answer was a motion, it shows that the parties certainly did not consider it as such. Nor do we.

Watson's answer bears little resemblance to the motion he filed subsequently. Pleadings must give fair notice of a claim, and we must construe them "so as to do

---

**7.** It was titled "Original Answer, Abatement and Special Exceptions to Plaintiffs' Original Petition."

substantial justice." Tex.R. Civ. P. 45. Construing the answer as a 101.106(f) motion would not comport with this rule. Even assuming Southwestern's 101.106 complaint was properly before us, Watson's answer was not a motion to dismiss under section 101.106(f).

## VI. Conclusion

Southwestern had the right of interlocutory appeal, but it also had actual notice and a timely substitution after a section 101.106 motion. We affirm the court of appeals' judgment. Tex.R.App. P. 60.2(a).

Justice JOHNSON delivered a dissenting opinion, joined by Justice WAINWRIGHT.

Justice JOHNSON, joined by Justice WAINWRIGHT, dissenting.

I agree that the Tort Claims Act's prerequisites to suit are jurisdictional as to the Arancibias' claim. And because the Arancibias did not give timely formal notice of their claim as required by the Tort Claims Act, U.T. Southwestern's immunity from suit was waived only if it had actual notice of the Arancibias' claim as the term "actual notice" is used in the Tort Claims Act. In order for Southwestern to have had actual notice, it had to have timely, subjective knowledge that it was at fault in causing Irene Arancibia's death. *See Tex. Dep't of Criminal Justice v. Simons*, 140 S.W.3d 338, 348 (Tex.2004). The basis for the Arancibias' claim that Southwestern was at fault is that the surgeons who first operated on Irene negligently caused her death by breaching the applicable standard of care. The Court does not identify evidence that Southwestern knew the injuries to Irene were caused by breach of a standard of care and that it therefore had actual subjective awareness it was at fault in causing Irene's death. Thus, I disagree with the Court's conclusion that South-

western had timely, actual notice of the Arancibias' claim within the meaning of the Tort Claims Act.

### I.

The Arancibia family did not give notice of claim to Southwestern, Parkland Hospital, where the surgery was performed, or any of the doctors who performed the first surgery until over seven months after Irene's death. By a letter dated May 7, 2004, they notified Dr. Mark Watson, who had supervised Irene's surgery, that the family intended to pursue legal action. On August 3, 2004, Irene's son and daughter filed suit against Dr. Watson and the doctors who had performed the surgery, Drs. Curtis and Yau, individually. They alleged that in several ways the doctors breached applicable standards of care and the breaches caused Irene's death. On January 28, 2005, the Arancibias amended their pleadings. They added Southwestern and Dallas County Hospital District d/b/a Parkland Hospital (collectively, the entities) as defendants and dismissed the doctors. The entities pled lack of notice under the Tort Claims Act and sought dismissal on the basis of sovereign immunity.

The trial court denied the entities' jurisdictional pleas and the court of appeals affirmed. 244 S.W.3d 455, 460.

Only Southwestern filed a petition for review. It asserts, in part, that sovereign immunity bars the Arancibias' claims because section 311.034 makes prerequisites to suit jurisdictional, *see* Tex. Gov't Code § 311.034, the Arancibias admittedly failed to give timely notice of claim under section 101.101(a), *see* Tex. Civ. Prac. & Rem.Code § 101.101(a), and Southwestern did not have actual notice of the claim pursuant to section 101.101(c). *See id.* § 101.101(c). In response, the Arancibias urge that formal notice to Southwestern was not required because they first sued the doctors

individually as opposed to the entities, and reading the Tort Claims Act to require pre-suit notice to Southwestern under such circumstances would yield an absurd result. They also claim that Southwestern had actual notice of their claim so formal notice under section 101.101(a) was not required.

## II.

Section 101.101(a) of the Tort Claims Act establishes the general rule that timely notice of a claim must be given to a governmental entity as a prerequisite to suit against that entity:

> A governmental unit is entitled to receive notice of a claim against it under this chapter not later than six months after the day that the incident giving rise to the claim occurred. The notice must reasonably describe:
>
> (1) the damage or injury claimed;
>
> (2) the time and place of the incident; and
>
> (3) the incident.

TEX. CIV. PRAC. & REM.CODE § 101.101(a). As the Court notes, the purpose of the notice requirement "is to ensure prompt reporting of claims in order to enable governmental units to gather information necessary to guard against unfounded claims, settle claims, and prepare for trial." *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex.1995) (citing *City of Houston v. Torres*, 621 S.W.2d 588, 591 (Tex.1981)).

Even absent the formal notice of claim required by section 101.101(a), however, section 101.101(c) waives a governmental entity's immunity if the entity "has actual notice that death has occurred, that the claimant has received some injury, or that the claimant's property has been damaged." TEX. CIV. PRAC. & REM.CODE § 101.101(c). In *Cathey*, the Court held that to have actual notice under section 101.101(c), the governmental unit must have "knowledge of (1) a death, injury, or property damage; (2) the governmental unit's alleged fault producing or contributing to the death, injury, or property damage; and (3) the identity of the parties involved." *Id.* at 341.

The Court clarified the second element of this standard—the governmental unit's alleged fault producing or contributing to the death, injury, or property damage—in *Simons*, a case strikingly similar to the case before us in regard to whether the governmental entity had actual notice of its fault. *See* 140 S.W.3d 338. In *Simons*, a work crew from the Terrell Unit of the Texas Department of Criminal Justice was digging postholes using an auger attached to a power take-off (PTO) mounted on the rear of a tractor. The auger became stuck in the ground, so the PTO was disengaged and a pipe wrench was attached to the auger in an attempt to back the auger out of the ground by hand. The TDCJ work supervisor, Ron Canon, left the area of the auger, went to the tractor and re-engaged the PTO. Simons was struck in the head and severely injured when the auger rotated and the pipe wrench swung around.

TDCJ immediately investigated and took statements from Canon and all the work crew. The statements and the report of the accident submitted by the prison safety officer indicated that when Canon went back to the tractor to re-engage the PTO, the pipe wrench had been taken off the auger, the workers had been told to stand clear of the auger, and Canon looked back before he engaged the auger and could see Simons but could not see that the pipe wrench, instead of being off the auger, was on the auger. *Id.* at 339–41.

Three days after the accident, the prison safety officer and the TDCJ regional safety officer took a statement from Simons who was in the hospital and on a prescrip-

tion pain reliever. Simons opined that the person operating the tractor was "kinda new." Simons remembered putting the pipe wrench on the auger and making one or two turns to back the auger out, and he did not remember hearing anyone say "stand clear." He also opined that he did not blame anyone for his injury, he did not want anyone to get in trouble or lose good time over it, it was a mistake and "a mistake is a mistake." 140 S.W.3d at 339–42. Thus, there was an unquestioned, unintended injury that resulted from a TDCJ employee's intentional act of re-engaging the PTO while a pipe wrench was attached to the auger, the wrench was out of the employee's field of view, and the injured person attributed the injury to a "mistake" without directing blame toward anyone specific.

The court of appeals held that TDCJ had actual notice under the Tort Claims Act. *Tex. Dep't of Criminal Justice v. Simons*, 74 S.W.3d 138, 142 (Tex.App.-Beaumont 2002), *rev'd*, 140 S.W.3d 338 (Tex. 2004). In reaching its conclusion, it noted that there was an unquestioned injury, a TDCJ employee had re-engaged the PTO that resulted in the injury, and an investigation was accomplished that put TDCJ on inquiry of its possible fault:

> To support its argument that its records do not raise a fact issue on notice of culpability, the Department relies upon the conclusion it reached after it completed its investigation of the incident. We are concerned here only with the Department's realization of its possible culpability, that is, whether the Department realized that it could be accused of negligence arising from the accident.... [T]he Department's safety officers conducted an extensive investigation of a serious injury that occurred while the inmates were operating motor-driven machinery in a supervised work detail. Reports were prepared and promptly submitted to the unit's safety committee. That notice, sufficient to put the Department on inquiry of its possible fault, is demonstrated by the existence of the safety review actually conducted. The Department did investigate the accident and gather the information it needed to defend Simons's claim.

*Id.* This Court disagreed and explained:

> What we intended in *Cathey* by the second requirement for actual notice was that a governmental unit have knowledge that amounts to the same notice to which it is entitled by section 101.101(a). That includes *subjective awareness of its fault, as ultimately alleged by the claimant,* in producing or contributing to the claimed injury. *If a governmental unit has this subjective awareness of fault, along with the other information to which it is entitled under section 101.101(a),* then requiring formal, written notice in addition would do nothing to further the purpose of the statute—which is, "to enable governmental units to gather information necessary to guard against unfounded claims, settle claims, and prepare for trial." It is not enough that a governmental unit should have investigated an incident as a prudent person would have, *or that it did investigate, perhaps as part of routine safety procedures, or that it should have known from the investigation it conducted that it might have been at fault.* If a governmental unit is not subjectively aware of its fault, it does not have the same incentive to gather information that the statute is designed to provide, even when it would not be unreasonable to believe that the governmental unit was at fault.

*Simons*, 140 S.W.3d at 347–48 (emphasis added).

Proof of a defendant's fault in a health care liability claim does not depend on proof of ordinary negligence, such as failing to assure that no one would be injured by the auger or an attached pipe wrench when a PTO on a tractor was engaged, but is rather dependant on proof that the defendant breached an applicable standard of care. *See* TEX. CIV. PRAC. & REM.CODE § 74.351 (requiring timely service of a report providing an expert's opinion regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed); *Murphy v. Russell,* 167 S.W.3d 835, 838 (Tex.2005). Then, if breach of a standard of care is shown and it is also proved that the breach proximately caused the injury, the defendant may be found liable for damages. *E.g., Hart v. Van Zandt,* 399 S.W.2d 791, 792 (Tex.1965) (noting that it is not enough in a medical negligence case to show an injury and that the injury might have occurred because of a doctor's negligence). In this case, the Arancibias allege that the surgeons who first operated on Irene were at fault because they breached standards of care. They also allege, of course, that the breaches caused her death and Southwestern is liable for the surgeons' fault or negligence.

## III.

### A.

The Arancibias first claim that they were not required to give notice of claim to Southwestern at all because they first sued the doctors individually. I disagree.

Under section 101.106 of the Tort Claims Act, plaintiffs must elect to sue either government employees or their employers. TEX. CIV. PRAC. & REM.CODE § 101.106. The Arancibias assert that the notice requirements of section 101.101 do not apply to suits against employees sued individually and because they first sued the doctors individually, interpreting the Tort Claims Act to require notice to the doctors' governmental-entity employers is unreasonable and absurd. They argue that plaintiffs will not generally give notice when they sue government employees individually because they are not required to. Thus, as will generally be the case, if notice has not been given to the entity, then requiring the governmental entity to be substituted for the employee is unfair and requires a futile action because the entity will do what Southwestern has done here and assert its lack of notice. The Arancibias, however, do not point to any language in the Tort Claims Act that indicates the Legislature intended section 101.106 to dispense with the notice requirements of section 101.101.

In responding, Southwestern makes four arguments: (1) section 101.101(a) specifies that it applies to any claim against a governmental entity "under this chapter," and the clear statutory language contains no exceptions; (2) the Legislature did not intend to allow plaintiffs to grant themselves an exemption from the notice requirement by suing employees first, and to do so makes no sense because regardless of when the governmental entity is sued it still needs notice, so it can investigate the claim; (3) the Arancibias' interpretation would eviscerate the notice requirements of section 101.101 because a plaintiff who failed to give notice could initially sue an individual employee, wait for the inevitable motion to dismiss the employee pursuant to section 101.106(f) and then sue the employer; and (4) it is not unfair, as the Arancibias claim, to require all claimants to give notice pursuant to section 101.101(a)—the notice requirement is

clearly stated and compliance is simple and inexpensive.

I agree with Southwestern. There is no language in the Tort Claims Act indicating the Legislature intended section 101.106 to allow persons to sue governmental entities without giving statutory notice. Regardless of the Arancibias' concerns, construing the Tort Claims Act's language as they urge would, for all practical purposes, negate the notice requirements of section 101.101(a). Plaintiffs who failed to give notice of claim as required could sue a governmental employee individually, wait for the employee to move for dismissal, and then sue the employer, thereby avoiding the notice requirements. Thus, I would hold that regardless of the fact that the Arancibias first filed suit against the doctors individually, the Arancibias must still have satisfied the notice prerequisites of section 101.101 in order to maintain their suit against Southwestern.

### B.

As to actual notice, the Arancibias urge that Dr. Watson's e-mails to his supervisor and the subsequent investigation prove, or at least create a fact question about, whether Southwestern had subjective knowledge of its fault. They also rely on testimony by Victor Arancibia that one of the surgeons who performed the corrective surgery after Irene returned to the hospital told Victor "somebody did something very wrong" during the first surgery and Victor should get a lawyer. Southwestern argues this evidence does not raise a fact question regarding whether Southwestern subjectively knew that breach of a standard of care, as ultimately claimed by the Arancibias, caused Irene's death.

First, Victor Arancibia's testimony that following the second (corrective) surgery, one of the surgeons told Victor that he should find a lawyer because someone had done something wrong during the first surgery is not evidence that Southwestern had subjective knowledge it was at fault in causing Irene's death. Victor did not identify the surgeon who made the statement and there is no evidence the surgeon was an employee of Southwestern or that the surgeon's opinion should be imputed to Southwestern. Further, whether "in the first operation somebody did something very wrong" is not the issue. Everyone agrees that the colon perforations were an unintended and undesirable result. The issue is whether Southwestern had subjective knowledge that the surgeons breached a standard of care appropriate to the laparoscopic surgery. That issue was not addressed by the statement Victor attributed to the unknown surgeon.

As for the actions of the doctors, immediately after Irene's death Dr. Watson e-mailed his supervisor, Dr. Edward Livingston, Chief of the Gastrointestinal Endocrine Surgery Division at Southwestern, and Dr. Robert Rege, Chair of both the Department of Surgery at Southwestern and the Division of Surgery at Parkland Hospital, about the situation. Dr. Watson described Irene's death as a terrible outcome, noted that he had "scrubbed the entire procedure," thought it went well, and advised Drs. Livingston and Rege that he had already spoken with risk management.

Parkland has a possible three-step review process that takes place when an unexpected patient care occurrence is identified. The first step is initial screening by the hospital's quality management team. The second is referral to a physician or monitoring committee if certain criteria are identified in the screening process. The third step is review by a Division Peer Review Committee if the second-step physician reviewer or monitoring committee so recommends.

Dr. Livingston was assigned to review the surgery as part of Parkland's quality control process.[1] His review was the second of the three-step process. The documents used by Dr. Livingston in making his report were preprinted with specific questions about most aspects of the patient's care. He answered in one instance that "[c]linical management contributed to" Irene's death and explained his answer by a narrative that "a technical error occurred during the original hernia operation resulting in a through-and-through small bowel injury." In regard to questions as to medical management, he checked the "No" box in response to "**Criteria 1 =** Practice [was] consistent with established standards. *Physician Reviewer* comfortable with practice. Practice Acceptable." However, he checked the "Yes" box in regard to "**Criteria 2 =** Reviewed practice not necessarily consistent with established standards, but still acceptable. *Physician Reviewer* comfortable with practice. Practice Acceptable." He checked additional boxes to indicate that the reviewed practice did not deviate or deviate significantly from established standards or that the practice was unacceptable. He included a narrative statement of his findings/conclusions in which he said that the unfortunate occurrence was a recognized complication of laparoscopic hernia surgery and no standard of care issues were identified. He did not recommend further review of the case. *See Roark v. Allen,* 633 S.W.2d 804, 811 (Tex.1982) (holding there was no evidence that a doctor's negligence proximately caused the injury when forceps slipped during delivery and a baby's skull was fractured).

In regard to Dr. Watson's e-mail statement that he had contacted risk management about Irene's death, evidence that an employee or agent contacted an enterprise's risk management department is not evidence that the employee or anyone else subjectively believed the enterprise was at fault. Most entities of any significant size have risk management departments and require accidents or unusual incidents to be reported to the risk management team. The reporting requirement generally exists regardless of who, if anyone, is suspected of being at fault in causing the accident or incident.

The Arancibias point to the fact that Dr. Watson contacted risk management, but the record does not contain evidence explaining why he made the contact or what he reported to risk management. For example, there is no evidence of whether (1) Dr. Watson contacted risk management pursuant to routine protocol because a death was involved or because of the unexpected patient outcome, (2) his contact was not routine but was out of an abundance of caution, or (3) his contact was because he subjectively believed a breach of appropriate standards of care caused Irene's death. Although Dr. Watson could not recall what he told risk management, the evidence is undisputed that he reported to Drs. Rege and Livingston that he believed the surgery went well and that the perforations could have been retraction injuries that occurred out of the field of view of the surgeons. Absent evidence of the reason Dr. Watson contacted risk management or what he reported, the fact the contact took place does not raise an inference that he believed Irene's death was due to a breach of applicable standards of care as alleged by the Arancibias any more than it raises an inference that the contact was the product of routine protocol or some other rea-

---

1. The parties stipulated that Dr. Livingston's investigation and findings could be considered for the purpose of determining if South- western had actual notice of the Arancibias' claim.

son. *Cf. Lozano v. Lozano,* 52 S.W.3d 141, 148 (Tex.2001) (Phillips, C.J., concurring in part and dissenting in part) (noting that the equal inference rule is a species of the no-evidence rule that "when the circumstantial evidence is so slight that any plausible inference is purely a guess, it is in legal effect no evidence"). For the same foregoing reasons, the fact that Dr. Watson reported his contact with risk management to Drs. Livingston and Rege, without more, does not support an inference that any of the doctors subjectively believed Irene's death was due to a breach of applicable standards of care.

Next to be considered are Dr. Livingston's investigation and report. The evidence shows that when a patient dies, Parkland's standard procedure is to have the case reviewed for quality management purposes. There is no evidence Dr. Livingston's review was other than pursuant to standard procedures. His report contains language that, considered in isolation or out of context, might support an inference that he developed a subjective belief the surgeons may have been at fault. For example, he indicated "[c]linical management contributed to" Irene's death, "a technical error occurred during the original hernia operation resulting in a through-and-through small bowel injury," and checked the "No" box in response to "Criteria 1 = Practice consistent with established standards. *Physician Reviewer* comfortable with practice. Practice Acceptable." But in considering all the evidence, as we must, Dr. Livingston's explanatory statement giving his opinions and conclusions cannot be disregarded. *See City of Keller v. Wilson,* 168 S.W.3d 802, 824–25 (Tex.2005). He checked boxes specifically indicating Irene's death was not the result of a breach of standards of care and in a narrative statement on the form he clearly set out his opinion that the unfortunate occurrence was a recognized complication of laparoscopic hernia surgery and "no standard of care issues were identified." *See Roark,* 633 S.W.2d at 811. He recommended that no further review be taken, and none was. The third step in Parkland's quality management follow-up process was not initiated and there is no evidence that further investigation of any nature was made.

The Court recently considered the actual notice issue in a non-health care setting in *City of Dallas v. Carbajal,* 324 S.W.3d 537 (Tex.2010). There, the plaintiff sued for injuries she suffered when she drove into a gap in the roadway in a construction area. A City of Dallas police officer promptly investigated the accident. The officer's written report indicated that the plaintiff drove through an unbarricaded area. The plaintiff sued over a year after the accident, but she had not given timely formal notice of claim to the City. The trial court denied the City's plea to the jurisdiction based on lack of timely notice under the Tort Claims Act and the court of appeals affirmed. The court of appeals' opinion turned on the City's immediate notice that an incident had occurred, the lack of evidence of a responsible entity other than the City, and the City's knowledge of its possible fault in the matter:

> [T]he police report here shows the City had *immediate notice* of the incident and its *possible fault* in failing to block the gap in the road properly with barricades. . . . [T]here is no evidence here of a responsible entity other than the City, and the police officer making the report is an employee of that entity. . . . [T]he police report here is more than just notice of an accident or a description of a road condition; it is the police officer's report of her perception of the cause of the accident.

*City of Dallas v. Carbajal,* 278 S.W.3d 802, 806 (Tex.App.-Dallas 2009), rev'd, 324

S.W.3d 537 (Tex.2010) (emphasis added). The Court reversed the court of appeals' judgment. In doing so, the Court quoted and emphasized some of the previously-quoted language from *Simons:*

"It is not enough that a governmental unit should have investigated an incident ..., or that it did investigate, perhaps as part of routine safety procedures, or that it should have known from the investigation it conducted that it might have been at fault. If a governmental unit is not subjectively aware of its fault, it does not have the same incentive to gather information that the statute is designed to provide, even when it would not be unreasonable to believe that the governmental unit was at fault."

*Carbajal,* 324 S.W.3d at 538 (quoting *Simons,* 140 S.W.3d at 347–48). The Court concluded that "[w]hen a police report does not indicate that the governmental unit was at fault, the governmental unit has little, if any, incentive to investigate its potential liability because it is unaware that liability is even at issue." *Id.* at 539. That same reasoning should apply to the Arancibias' claim.

Dr. Livingston was designated to investigate the care Irene received and determine whether breaches of applicable standards of care occurred as part of routine procedures. His report shows that he recognized the perforations in Irene's bowel were technical errors, yet it also shows his opinion was that the perforations were a recognized complication of the surgery Irene underwent and were not outside the boundaries of accepted standards of care. He made an unambiguous hand-written summary statement to that effect and recommended that no further review of the matter take place. Dr. Livingston explained his reasoning in his deposition and maintained that his report correctly set out his subjective opinion that there were

no standard of care violations. Based on Dr. Livingston's recommendation, the third step of Parkland's quality management review process did not occur. And there is no evidence that before the Arancibias finally sent their letter notice to Dr. Watson more than seven months after Irene's death, Southwestern believed it should take action to gather information "necessary to guard against unfounded claims, settle claims, and prepare for trial." *See Cathey,* 900 S.W.2d at 341.

The Court's holding today does not take into account the nature of determining "fault" in health care cases. All the physicians recognized that the unrepaired perforations and Irene's death were bad results. But although there is always possible, or potential, liability for a bad health care result, a bad result simply is not evidence that a health care provider was at fault because standards of care were breached. The Arancibias dispute Dr. Livingston's opinion, but they do not point to any reason for Southwestern to have subjectively disbelieved the sincerity of his findings and conclusions. Nor do they refer to evidence that Southwestern or any of its physicians discounted Dr. Livingston's investigation and opinion or otherwise independently formed a subjective belief that the surgeons caused the perforations by breaching any standards of care. Thus, there is no evidence that Drs. Watson, Livingston, Rege, or Southwestern had subjective knowledge or belief that the surgeons and Southwestern were at fault in regard to Irene's death—and until today such knowledge has been required for actual notice when a litigant fails to give timely formal notice of claim.

In *Simons,* the Court stated that "a governmental unit cannot acquire actual notice merely by conducting an investigation, or even by obtaining information that would reasonably suggest its culpability.

The governmental unit must have actual, subjective awareness of its fault in the matter." 140 S.W.3d at 348. And in *Carbajal,* the Court rejected the argument that immediate knowledge of the facts by the City of Dallas together with the absence of evidence of other responsible parties and its knowledge of possible fault because of missing barricades was actual notice. 534 S.W.3d at 539. The Court should likewise reject the argument that Southwestern had actual notice because it knew of injuries and knew of undetected and uncorrected technical errors that potentially could generate allegations that the injuries were caused by breaches of standards of care.

## IV.

I agree that statutory notice is jurisdictional under the Tort Claims Act as it applies to this case. I would hold that the notice issue is dispositive: Southwestern did not have actual notice, thus the Arancibias were required to, but did not, give timely formal notice. I would reverse the judgment of the court of appeals and dismiss the Arancibias' suit against Southwestern for lack of jurisdiction.