

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-16-00368-CV

UNIVERSITY OF NORTH TEXAS
HEALTH SCIENCE CENTER

APPELLANT

V.

JESSICA JIMENEZ, JENNIFER
GALO, CATHERINE FRANK, IN
THEIR INDIVIDUAL CAPACITIES,
AND WILLIAM TYLER II, AS
INDEPENDENT ADMINISTRATOR
OF THE ESTATE OF PAMELA J.
KNIGHT, DECEASED

APPELLEES

----------

FROM THE 352ND DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 352-275721-14

----------

## MEMORANDUM OPINION[1]

----------

---

[1]*See* Tex. R. App. P. 47.4.

We are asked to decide, under section 101.101(c) of the civil practice and remedies code, whether certain entries in medical records equate to actual notice to Appellant University of North Texas Health Science Center, a governmental unit, of an injury to its patient Pamela Knight—an injury that is alleged to have triggered a cascade of problems leading to her death. If the records sufficed to put UNT Health on notice within the meaning of section 101.101(c), then the trial court properly denied UNT Health's motion to dismiss for lack of subject-matter jurisdiction.[2]

We hold that UNT Health did not have the requisite actual notice within the meaning of the code and reverse the decision below.

## Background

In the latter part of 2012, Pamela Knight became a patient of UNT Health and its employee Dr. Albert H. Olivencia-Yurvati, D.O. Dr. Yurvati has been a UNT Health faculty member for over two decades, and currently chairs UNT Health's Department of Surgery. The record does not reveal when Dr. Yurvati

---

[2]In the trial court, both UNT Health and codefendant Columbia Plaza Medical Center of Fort Worth had earlier and unsuccessfully challenged the plaintiffs' expert report under civil practice and remedies code section 74.351(a) as inadequate. Plaza Medical appealed the trial court's ruling; we affirmed. *Columbia Plaza Med. Ctr. of Fort Worth, Subsidiary, L.P. v. Jimenez*, No. 02-15-00275-CV, 2016 WL 2586738 (Tex. App.—Fort Worth May 5, 2016, no pet.) (mem. op.). UNT Health did not similarly appeal but instead then moved to dismiss on different grounds, this time based on (1) the plaintiffs' conceded failure to comply with the six-month-notice requirement of civil practice and remedies code section 101.101(a) and (2) the alleged lack of the actual notice that under section 101.101(c) can take the place of formal notice. *See* Tex. Civ. Prac. & Rem. Code Ann. § 101.101(a), (c) (West 2011).

became department chair, nor does it show what sorts of duties—investigative, reporting, risk-management-related, or otherwise—accompany that position.

Knight, who was overweight, had undergone gastric lap-band surgery at a weight-loss facility the previous year and, after complications necessitated the band's removal, ultimately developed a significant side effect known as "nutcracker esophagus." This painful condition results in such strong and involuntary esophageal contractions that food has difficulty reaching the stomach.

After evaluating Knight, Dr. Yurvati recommended surgery—a "left thoracotomy with extensive esophageal myotomy"[3]—and performed that procedure on December 11, 2012. The next day, December 12, Dr. Yurvati ordered an esophagram, which showed no problems. But in the days that followed, Knight's condition "began to markedly deteriorate"; she developed low levels of oxygen concentration in her blood (hypoxemia) and needed support ventilation in the form of bilevel positive airway pressure so that she could breathe.

After a thoracostomy procedure on December 17 that placed a chest tube in Knight's left lung—needed because of a loculated pneumothorax—her

---

[3]In layman's terms, this means making an incision in the chest wall to access and to then cut away some of the outer tissue layers from the lower esophagus.

condition continued to worsen.[4] Eight days after Knight's initial surgery, a second esophagram on December 19 revealed a leak in her esophagus that, according to Appellees, had resulted from an esophageal perforation during the December 11 surgery. Despite Dr. Yurvati's attempt to repair the perforation on December 20 through a second thoracotomy, Knight's condition worsened to the point of developing a massive infection.

Months of additional medical problems and procedures culminated in Knight's death in May 2013 at the age of 56. In November 2014, Appellees—Knight's brother (as estate administrator) and Knight's mother and two adult daughters—sued UNT Health and Plaza Medical for medical negligence.[5]

### UNT Health's records

Because both sides agree that UNT Health was not given written notice of the incident forming the basis of the plaintiffs' claims within six months of December 11, 2012, *see* Tex. Civ. Prac. & Rem. Code Ann. § 101.101(a), we focus only on whether Knight's medical records as maintained by UNT Health provided "actual notice" to that entity that she had "received some injury." *Id.* § 101.101(c).

---

[4]A thoracostomy differs from a thoracotomy in that a thoracostomy involves a small incision, whereas a thoracotomy involves a larger opening so that a surgeon can access internal organs and areas such as the esophagus. A "loculated pneumothorax" means an air pocket in the pleural space between someone's lung and the chest wall.

[5]Dr. Yurvati was originally also a named defendant but is no longer a party.

4

Knight's family points us to Dr. Yurvati's December 20, 2012 operative report, which contains entries that they contend satisfy the statute:

> PREOPERATIVE DIAGNOSES:
> 1. Distal *esophageal perforation.*
> 2. Status post esophageal myotomy.
>
> PROCEDURES PERFORMED:
> 1. Left thoracotomy with *repair of esophageal perforation* utilizing modified T-tube repair.
> 2. Decortication. (Emphases added.)

This operative report also includes these details in its "Findings" section:

> At the time of [the December 11] surgery, there appeared to be no evidence of any injury to the esophagus or perforation. As a matter of fact, she had a postoperative esophagram that was completely clean. About 4 days after surgery, she was having significant pain and discomfort in her chest. She developed what appeared to be a loculated hemopneumothorax after her drains had been removed. A small bore catheter was placed and re-expanding the upper portion of the lung; however, she did not do well and had evidence of a leaky drainage from her chest tube site. This became quite apparent yesterday [December 19] and an esophagram confirmed that there was a distal leak. It was recommended that she urgently should undergo surgical intervention. . . . She was brought to the operating room and once we cleared away and were able to identify the esophagus, there appeared to be a 5cm *linear tear in the esophagus*. This *appeared to be secondary to* some ischemia and then *a perforation*. The edges appeared to be viable and clean. [Emphases added.]

Further into the report, Dr. Yurvati described the December 20 procedure, noting that when the esophagus was exposed during this thoracotomy, "[a]bout the distal 1/3, there appeared to be evidence of a linear 5cm perforation which was clearly visible."

5

Our review of the record also reveals that nearly a month later, on January 18, 2013, Dr. Yurvati signed a medical certification requested by Knight's Family and Medical Leave Act coverage provider. There, he recounted her various procedures, including "12-20-2012 left thoracotomy [with] repair of esophageal perforation utilizing modified T-tube repair and decortication."

This document is part of UNT Health's medical records, as is Dr. Yurvati's "History and Physical" from slightly earlier (the fax heading is dated January 9, 2013), which described Knight's difficulties following the December 11 surgery:

> Subsequently, she started having some milky fluid out from her chest drains. Then she became quite hypoxic and short of breath. A chest x-ray film showed a loculated left pneumothorax. A small bore catheter was placed to help reinflate the lung and [resolve] this. I was very concerned with a possible delayed per. Immediately postoperatively about day 1-2, she did have an esophagram that showed excellent flow through without any evidence of perforation at that time. This was a clean study. However, [w]as concerned now few days later with her symptomatology and a loculated pneumothorax and the drainage, that indeed we may have had a problem.

The repeated references in UNT Health's records to an esophageal "perforation" contrast with Dr. Yurvati's affidavit, which UNT Health filed with its motion to dismiss and in which he discussed the December 20 procedure: "During the procedure, I located a linear tear in Ms. Knight's esophagus. I determined that the tear did not occur[] as a result of any act or omission on the part of myself or any other health care provider." As indicated in Dr. Yurvati's December 20 operative report quoted earlier, however, a "tear" and a "perforation" do not appear to be synonymous. Nonetheless, neither UNT

6

Health's medical records nor the appellate record as a whole demonstrates that a perforated esophagus necessarily—or even most likely—must result from medical error.[6]

**Standard of review**

We review de novo a trial court's ruling on a plea to the jurisdiction, which is essentially what UNT Health raised through its motion to dismiss for lack of subject-matter jurisdiction. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000) (noting that absence of subject-matter jurisdiction may be raised by different procedural vehicles); *In re Tex. Dep't of Transp.*, 510 S.W.3d 701, 705 (Tex. App.—El Paso 2016, orig. proceeding) (citing *Bland ISD* and noting that "jurisdictional challenge[s] can be raised by a number of procedural vehicles, including a plea to the jurisdiction, a motion to dismiss, or a motion for summary judgment").

If a plea to the jurisdiction or comparable procedure challenges the existence of jurisdictional facts, we consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, just as the trial court must. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227 (Tex.

---

[6]Appellees' brief states that there can "be no doubt that the perforation noted in [UNT Health's] records could only have occurred during the surgical procedure previously performed by Dr. Yurvati." That could well be true, but absent some record support, we cannot so conclude. The medical records might imply, at least to laymen like us, that esophageal perforations do not occur without human agency, but that is not the same as the kind of evidence from which actual notice can be fairly assumed or from which a fact issue arises.

7

2004); *Bland Indep. Sch. Dist.*, 34 S.W.3d at 555; *City of Wichita Falls v. Jenkins*, 307 S.W.3d 854, 857 (Tex. App.—Fort Worth 2010, pet. denied). If the evidence creates a fact question on the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the factfinder will resolve the question. *Miranda*, 133 S.W.3d at 227–28; *Jenkins*, 307 S.W.3d at 857. But if the relevant evidence is undisputed or fails to raise a fact question on the jurisdictional issue, the trial court rules on the plea as a legal matter. *Miranda*, 133 S.W.3d at 228; *Jenkins*, 307 S.W.3d at 857. This standard generally mirrors that of a traditional summary judgment. *Miranda*, 133 S.W.3d at 228; *see* Tex. R. Civ. P. 166a(c).

Although actual notice is a fact question when the evidence is disputed, in many instances it can be determined as a matter of law. *Tex. Dep't of Criminal Justice v. Simons*, 140 S.W.3d 338, 348 (Tex. 2004). Here, the parties do not dispute the evidence presented on the jurisdictional issue; they simply dispute its legal significance. Accordingly, we will review the trial court's ruling as a matter of law. *See id.*; *Miranda*, 133 S.W.3d at 228.

We have jurisdiction over the trial court's interlocutory order under section 51.014(a)(8) of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8) (West Supp. 2016).

**Discussion**

Because Appellees concede that they did not give UNT Health formal written notice of their claims within six months of December 11, 2012, we thus

8

sustain UNT Health's first issue and analyze only UNT Health's second issue, which questions whether UNT Health had actual notice sufficient to satisfy the Texas Tort Claims Act's requirements. If it did, its sovereign immunity was waived, and the trial court properly denied UNT Health's motion to dismiss. *See id.* §§ 101.021(2) (West 2011), 101.101(a), (c).[7]

Actual notice acquired within six months can replace the need for formal notice if a governmental unit knows of (1) a death or an injury, (2) its alleged fault in producing or contributing to that death or injury, and (3) who exactly died or was injured. *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995); *Jenkins*, 307 S.W.3d at 858. But "[s]tanding alone, knowledge that an injury has occurred does not establish actual notice." *Univ. of Tex. Health Sci. Ctr. at Houston v. Cheatham*, No. 14-14-00628-CV, 2015 WL 3878111, at *3 (Tex. App.—Houston [14th Dist.] June 23, 2015, no pet.) (mem. op.) (citing *Univ. of Tex. Health Sci. Ctr. at Houston v. McQueen*, 431 S.W.3d 750, 755 (Tex. App.—Houston [14th Dist.] 2014, no pet.)). The supreme court put it succinctly in *Cathey*: the plaintiffs "argue that section 101.101(c) requires only that a governmental unit have

---

[7]In a case against a governmental unit, sovereign immunity is not waived under the Texas Tort Claims Act unless a claimant satisfies the prerequisite either of (1) providing formal notice "not later than six months after the day that the incident giving rise to the claim occurred" that "reasonably describe[s]" the "damage or injury claimed," "the time and place of the incident," and "the incident"; or (2) showing that the governmental unit had "actual notice [within that same six-month period] that death has occurred, that the claimant has received some injury, or that the claimant's property has been damaged." Tex. Civ. Prac. & Rem. Code Ann. § 101.101(a), (c).

knowledge that a death, an injury, or property damage has occurred. We disagree." 900 S.W.2d at 341.

It is also not enough even that the governmental unit "should have investigated an incident as a prudent person would have, or that it did investigate, perhaps as part of routine safety procedures, or that it should have known from the investigation it conducted that it might have been at fault." *Simons*, 140 S.W.3d at 347–48. Rather, the governmental unit must have knowledge equivalent to what a formal section 101.101(a) notice would have provided, which "includes subjective awareness of its fault, as ultimately alleged by the claimant, in producing or contributing to the claimed injury." *Univ. of Tex. Sw. Med. Ctr. at Dallas v. Estate of Arancibia*, 324 S.W.3d 544, 548–49 (Tex. 2010) (quoting *Simons*, 140 S.W.3d at 347). In a case such as this one, medical records may create a fact issue on actual notice only if they "indicate to the [government] hospital its possible culpability in causing the injuries." *Dinh v. Harris Cty. Hosp. Dist.*, 896 S.W.2d 248, 253 (Tex. App.—Houston [1st Dist.] 1995, writ dism'd w.o.j.).

We have reviewed UNT Health's records and cannot find within them anything that rises to the level of subjective awareness that UNT Health was at fault in producing or contributing to Knight's injuries. References to a perforated esophagus, in and of themselves, simply do not suffice. Our conclusion comports with caselaw similarly dealing with medical records as the purported basis for actual notice. *See Cathey*, 900 S.W.2d at 341–42 (finding no knowledge on

10

government hospital's part of alleged culpability for stillbirth where medical records might have revealed only that Cesarean section was performed more than half an hour after it should have been); *McQueen*, 431 S.W.3d at 760–61 (holding no subjective awareness of fault from medical records that noted "bowel injury during hysterectomy"); *Reynosa v. Bexar Cty. Hosp. Dist.*, 943 S.W.2d 74, 78 (Tex. App.—San Antonio 1997, writ denied) (holding insufficient, for actual-notice purposes, medical records concerning brain-damaged baby where those records consisted of handwritten reports by doctors and nurses documenting extent of baby's injuries, a fetal-heart-tone-monitoring strip, and a nurse's handwritten note); *see also Cheatham*, 2015 WL 3878111, at *5 (holding, in case involving overlooked surgical needle, that government healthcare entity lacked subjective awareness where records suggested nothing more than that private-hospital surgical nurses, whose job it was to account for all needles, may have been the sole producers of or contributors to plaintiff's injury by missing one of them).

Our inquiry does not end here, though, because in addition to the actual notice that might appear wholly within an entity's records—but here does not—a governmental unit's agent's or representative's knowledge of the three *Cathey* factors may be imputed to the entity under certain circumstances. *E.g.*, *McQueen*, 431 S.W.3d at 755 ("Actual notice may be imputed to the governmental entity by an agent or representative who receives notice of the *Cathey* elements and who is charged with a duty to investigate the facts and

11

report them to a person of sufficient authority."); *Univ. of Tex. Health Sci. Ctr. at San Antonio v. Stevens*, 330 S.W.3d 335, 340–41 (Tex. App.—San Antonio 2010, no pet.) (disagreeing that only a designated risk manager's knowledge may be imputed and holding that actual notice was imputed where pediatrics-residency-program director conducted faculty review of incident involving resident's administering wrong medication and, under the contract between residency program and hospital, the director had agreed to investigate any problems involving residents); *Johnson v. Nacogdoches Cty. Hosp. Dist.*, 109 S.W.3d 532, 537 (Tex. App.—Tyler 2001, pet. denied) (holding that hospital director's awareness that decedent had come to the emergency room and not been treated, and director's awareness of potential for liability, raised fact question about whether hospital had actual notice).

But not all government-hospital employees—even treating physicians—hold positions from which their own knowledge will be imputed to the entity.[8] Caselaw most often highlights the doctor's particular role: a government doctor who has oversight responsibilities tends to have his or her knowledge treated as tantamount to that of the entity itself. That was true in *Stevens*, and it was true when, some two months later, the supreme court decided *Arancibia*.

There, in affirming the trial and appellate courts' denial of UT Southwestern's jurisdictional challenges on actual-notice grounds, the *Arancibia*

---

[8]Appellees' discussion of imputed knowledge relies simply on the records of Dr. Yurvati's treatment.

court set out the following chain of events and knowledge on a supervisor's part concerning a patient's death after two surgical residents botched a hernia surgery by perforating her bowel:

> Dr. Watson [an assistant professor of surgery who supervised the procedure] was present during Arancibia's laparoscopic hernia repair. The day after her death, Watson emailed his immediate supervisor, who was chief of the division. The email begins, "I wanted to give you a heads up on a terrible outcome with a Surgery A patient." Watson described the surgery, which he believed went well, and Arancibia's return to the emergency room two days later. A laparotomy at that time "showed an unrecognized bowel injury," and Arancibia died the next day of multiple organ failure. Watson's email concluded, "I have already spoken with risk mgt."

324 S.W.3d at 549. Dr. Watson's supervisor then contacted the chair of the surgery department, who in turn responded with an email outlining several reasons why a patient such as Arancibia might present with her symptoms more than 24 hours after surgery. *Id.* Despite the supervisor's later conclusion that bowel perforation was a known complication of the surgery and that no standard-of-care issues were implicated, the supreme court nevertheless found that the supervisor's "ultimate conclusion that those errors were acceptable does not detract from his subjective awareness that medical error contributed to Arancibia's death." *Id.* at 549–50.

From these facts the court had little trouble concluding that UT Southwestern was subjectively aware of its fault, particularly when "the sole instrumentality of harm [was] the government itself." *Id.* at 550 (distinguishing *City of Dallas v. Carbajal*, 324 S.W.3d 537, 539 (Tex. 2010), in which the court

13

found no subjective awareness of fault on City's part where missing barricades led to plaintiff's driving into roadway excavation because "a private contractor or another governmental entity (such as the county or state) could have been responsible" for the missing barricades).

In contrast here, Knight's surgery occurred not at UNT Health but at Plaza Medical, a private hospital. Although an injury's location is not outcome-determinative,[9] the possibility of nongovernmental actors' involvement with a particular injury is a factor bearing on the subjective-awareness component.

But even assuming that Dr. Yurvati believed (but never expressed) that he had negligently perforated Knight's esophagus, another obstacle for Knight's family in defeating governmental immunity is that we have no evidence about Dr. Yurvati's position or duties from which we can conclude that his knowledge should be imputed to UNT Health. *Cf. id.* (stating that the government, in the form of UT Southwestern, had "conceded that its surgical error perforated Arancibia's intestine, resulting in sepsis, multiple organ failure, and death"; it was "undisputed" that UT Southwestern "was aware that its surgeons' errors caused

---

[9]For example, *Stevens* involved an incident at a nongovernmental hospital at which the UT Health San Antonio pediatrics-residency director officed, and from which he supervised the pediatrics residents. 330 S.W.3d at 337. On the other hand, actual notice was absent even where "the events of which the [plaintiffs] complained all happened in the [government] hospital and involved hospital personnel." *Simons*, 140 S.W.3d at 344 (discussing *Cathey*, 900 S.W.2d at 341–42).

those perforations and that clinical management contributed to [Arancibia's] death"). Here, UNT Health has conceded nothing similar.

Beyond the facts that—as his affidavit states—Dr. Yurvati has been a UNT Health faculty member for over 20 years and at some unknown time became chair of UNT Health's Department of Surgery, the record does not suggest that simply by virtue of being a faculty member or department chair he was tasked with investigating or reporting incidents. Appellees do cite one case to posit that physicians, by their very nature, have a duty to gather facts and investigate incidents. *See Tex. Tech Univ. Health Scis. Ctr. v. Apodaca*, 876 S.W.2d 402, 412 (Tex. App.—El Paso 1994, writ denied) ("Dr. Lakho and Dr. Rosen, as physicians, did have the duty to gather facts and investigate the incident."). But *Apodaca* involved additional facts that the court recited immediately following the above quotation:

> Further, the incident was reported to Appellant [Texas Tech HSC] by virtue of the Incident Report signed by Dr. Lakho. The report itself is printed on a form containing Appellant's name, and shows that it was reviewed by a member of Appellant's "risk management" department two days after the incident.

*Id.* We are unaware of any case holding that a treating physician's knowledge is automatically imputed to his or her governmental-unit employer, and *Apodaca* does not stand for that proposition.

Consistent with *Cathey* and *Simons*, then, actual notice cannot be imputed from knowing that a patient received treatment from one of its doctors, or even that the patient died; otherwise, a hospital "would be required to investigate the

15

standard of care provided to each and every patient that received treatment." *Simons*, 140 S.W.3d at 344 (quoting *Cathey*, 900 S.W.2d at 341). UNT Health's motion to dismiss should have been granted on lack-of-notice grounds, and we therefore sustain UNT Health's second issue.

## Conclusion

Having sustained UNT Health's first and second issues, we reverse the trial court's order denying UNT Health's motion to dismiss and render judgment dismissing Appellees' claims against UNT Health for lack of subject-matter jurisdiction.

/s/ Elizabeth Kerr
ELIZABETH KERR
JUSTICE

PANEL:  WALKER, GABRIEL, and KERR, JJ.

DELIVERED:  August 3, 2017

16