## ALEXANDER E. ORR v. THE CITY OF BROOKLYN.

*New York, County of,—Boundary—Jurisdiction.*

The waters of the Atlantic Basin, on the Brooklyn side of East River, are within the county of New York, and the city of Brooklyn is not liable for the destruction by a mob of a floating elevator within such basin.

This is an action founded on the statute of this State, passed April 13, 1855, by which compensation was given to parties whose property was destroyed by mobs or riots by an action against the city or county in which the property was situated. The action was against the city of Brooklyn, and the complaint alleged the destruction of the Plaintiff's floating elevator, with its machinery, on the night of July 15, 1863, and that the elevator, at the time of its destruction, was in the Atlantic basin, in the Twelfth Ward of the city of Brooklyn. The question presented is, whether the locus in quo of the elevator, at the time of its destruction, was within the boundaries of the county of Kings, of which county the city of Brooklyn was a portion. Under the charge of the Judge at the Circuit, the jury found a verdict for the Plaintiff for the value of the property destroyed, the Judge deciding the locality to be within the county of Kings.

The General Term of the Second District affirmed the judgment upon this verdict, and the Defendant now appeals to this Court. The facts are fully stated in the opinion of the Court.

*Alexander McCue* for the Appellants.

*C. Van Sanfoord* for the Respondent.

Hunt, J.—At the time of its destruction the elevator was lying in the Atlantic basin. This basin is on the Brooklyn side of the East River, which separates the city and county of New York from the county of Kings and from the city of Brooklyn, which forms a portion of the latter county.

The East River is an arm of the sea, forming the westerly end of Long Island Sound, and connecting with New York bay and the Atlantic Ocean.

This basin is bounded on three sides by land, and on the fourth side is separated from the East River by piers, except for a space of about two hundred feet, which may be called the outlet or inlet of the basin.

The exterior lines of these piers extend along the bulkhead line, or permanent water line, as fixed by the act of May 26th, 1841, hereafter referred to.

The elevator laid inside of this bulkhead line, and inside of the line of Ferris street, in the said act also referred to. There are warehouses on these piers around the basin, on which the city of Brooklyn collects taxes. The evidence showed that the place where the elevator lay was below the original low-water mark on the shore of the East River, having an original depth of two or three feet, and was in water then of the depth of eighteen feet, the additional depth being caused by dredging. It also appeared that it was upon the tide-waters of the East River.

By the 3d Rev. Stat., p. 2 (1st edition), the county of Kings is bounded " northerly by the county of New York." By the same statute the county of New York, after giving previous courses, is bounded as follows : " then to cross over to Nassau, or Long Island, to low-water mark there ; . . . then along Nassau, or Long Island shore, at low-water mark, to the south side of the Red Hook." The county of New York was described in the statute of 1788 as commencing " at Spuyten Duyvel Creek, where the same empties itself into the Hudson River, on the Westchester side thereof, at low-water mark, wherever the same now is, or hereafter may be, and so running along said creek at low-water mark, as aforesaid ; . . . thence to cross to Nassau Island to low-water mark there, as aforesaid ; . . . thence along Nassau Island shore at low-water mark, as aforesaid, unto the south side of the Red Hook."

The Red Hook is westerly of the Atlantic basin and docks.

The elevator, when destroyed, was lying inside of the piers

erected by the owners of adjacent water lands, under the acts of May 25, 1836 (ch. 484), and of May 26, 1841 (ch. 268).

These acts authorized the then owners of land under water to erect and maintain wharves, warehouses, and piers on the land under water, in front of their lands, within certain limits mentioned, and of which Partition and Ferris streets formed the western and northern boundary, and certain streets named the other boundaries.

By the first of said acts three commissioners were designated, whose duty it was made to determine a permanent line of bulk-head in the East River, which might be erected without injuring the navigation of the river, and that no bulkhead should be extended into the river beyond said point. The effect of these acts is merely this: certain privileges are gratuitously allowed to the owners of adjacent water lands, and means are adopted to establish a permanent line, beyond or outside of which it shall not be permitted to erect any structures. These acts are designed to regulate that subject simply, and do not profess to affect the question of boundary or jurisdiction. In my judgment they do not affect it.

Nor in my view of the case is the difference in the language of the statutes giving the boundaries of the county of New York important in the present case. The Revised Statutes (sup.) speak of low-water mark on Long Island as the boundary of the county, while the statute of 1788 (sup.) gives the starting-point at low-water mark on Spuyten Duyvel Creek, wherever the same now is, or hereafter may be, and speaks of the low-water mark " as aforesaid," on the Long Island shore. This case is not affected by this difference, as will be seen.

It is conceded that the place where this elevator laid when she was destroyed was below the original low-water mark, and was then upon the tide waters of the East River, at the depth of eighteen feet. The county of Kings extended, by statute, only to the low-water mark of this river. What, then, are the facts or the principles upon or by virtue of which it is claimed that the elevator was nevertheless within the county of Kings?

It is said that the descriptive words, "Along the Long Island shore at low-water mark" to Red Hook, excludes from New York, and includes in Kings, all creeks, or tidal basins, or whatever else is on the Long Island side of the shore line. Assuming this to be true, how does it affect a case like the present, where the locus is conceded to be below or outside of the shore line, and where there is no creek or natural basin?

At this time, and always, so far as the proof indicates, the spot where the elevator laid was under water.

It was naturally three feet below water mark, and is now, by dredging, eighteen feet below water mark, and is a part of the original open river, as distinguished from a creek or estuary.

If the evidence had sustained the idea that this spot was originally above low-water mark, and had now become below it, either by natural or artificial means, or that it was a portion of a creek or estuary, the argument would have been a strong one. The facts do not warrant such a claim.

The case of Luke *v.* The City of Brooklyn (43 Barb. 54), and affirmed in this Court in 1865, is cited by the Respondent. Like the present, that was an action to recover damages for the destruction of an elevator by a mob or riot. The elevator stood upon a pier built into the Atlantic basin, which was connected with a pier outside of it, and connected also with the wharf on the shore. The point at which it stood was originally some feet below water mark, and was made still deeper in the water by dredging.

The Court held the Defendant liable, and upon the question of location say : "Low-water mark is claimed by the Defendant to be the dividing-line between the cities of New York and Brooklyn. But we think it is low-water mark, for all the purposes of this action, as the water flows after the land is reclaimed from the river or bay by the erection of wharves and piers, and the filling in from the shore for that purpose. The jurisdiction of the city of Brooklyn must, from necessity, follow the shore as it advances into the river or bay, whether the accretion proceeds from alluvion or artificial deposits and erections. This is asserted in

Udall v. Trustees of Brooklyn (19 John. R. 175)." I concur in this decision.

The wharves or piers are a part of the shore, and, as they were necessarily above the surface of the water, they were above the low-water mark, which gave jurisdiction. This does not affect the case now before us; and the difference between a case of a permanent erection above the water, like a dock or pier, and a vessel floating upon the water, is well illustrated by the cases of Udall v. Trustees of Brooklyn (supra), and the case of Stryker v. The Mayor, next reported in the same volume (19 John R. 179).

The former was a successful attempt to recover a penalty for measuring grain without a license on a dock in the city of Brooklyn, although the dock was beyond the natural low-water mark on the Long Island shore. The Court maintained the action, on the ground already stated.

The latter case was an attempt to recover a penalty for measuring grain on board of a vessel, made fast to the end of a dock on the Brooklyn shore of the East River, where the vessel was beyond the natural low-water mark, and the attempt failed.

The Court held that although the shore line could be extended by means of docks or wharves, it could not be extended by means of a vessel floating in the river, although she was fastened to the dock. The case of Luke v. The City of Brooklyn is therefore by no means decisive of the present case.

The piers and wharves may be parts of the shore, and within the county of Kings, and the space enclosed within them may yet be within the county of New York.

Indeed, I do not understand how a boundary line can be carried out, except upon this theory. Here is an open space, from the points of the piers, as they front upon the East River, of two hundred feet in width, of the depth of thirty feet, and below the natural low-water mark. Now, where is the shore at this point ? The cut is entirely open to the river on the one side, and free from any erection or structure till it reaches Commercial street on the mainland on the other side. I think no one can say that this two hundred feet of open space is the shore or low-water mark.

If not, the shore must be found on Commercial street, directly opposite to it. It results from this that the line of Kings county may follow the low-water mark as the Long Island shore, till it reaches the piers established by authority of the acts of 1836 and 1841, already cited, at Hamilton avenue. It may then follow the outer line of the pier till it reaches the cut or opening of the Atlantic basin, then follow the inner line of the pier, around the four sides of the piers, and around the lines of the inner piers or wharves, till it reaches the westerly side of the cut or opening, then resuming the low-water mark westerly along the shore of Long Island.

This, I think, is the true statement of the case, and it results in leaving the waters of the Atlantic basin within the territorial limits of the county of New York (see Mahler *v.* Transportation Co., 35 N. Y. 352).

Some stress is laid upon the effect of the act of April 17, 1854 (p. 829, §§ 1, 13) where the Twelfth Ward of the city of Brooklyn is described as beginning on the East River, at the centre line of Hamilton avenue, thence southerly along Hamilton avenue, &c., returning along Gowanus bay and East River to the place of beginning.

It is claimed that these outer lines include the premises in question. Without examining whether such would be the necessary effect of the description, it is a sufficient answer to say that this act was not intended to alter or determine the boundaries of the county. Assuming the boundaries to be fixed by law, a division was made of the territory as it existed into different wards, and that portion of it within the outer lines described, it was enacted, should constitute the Twelfth Ward. This was the extent of its effect.

Neither is it a circumstance of importance that the warehouses and erections upon the piers are subject to taxation by the city of Brooklyn, and that the taxes are annually collected upon them by that authority. I have shown the difference between the piers themselves and the waters enclosed by them.

The former are, by the decision of the Courts and the necessi-

ties of the case, extensions of the shore, form a part of the dry land, and are therefore properly subject to taxation.

The waters below low-water mark, and the lands under them, are, on the other hand, expressly declared to be within the limits of the county of New York.

The constitutionality of the act of 1855 has been sustained in this Court in Darlington *v.* The Mayor (31 N. Y. R. 164), and in Luke *v.* Brooklyn (sup.).

I see no error in the statement of the Plaintiff's title to the property, or in the amount of his damages.

The point of the locality of the vessel at the time of her destruction is, however, fatal to the Plaintiff's right of recovery.

Judgment must be reversed, and a new trial ordered. All reverse.

JOEL TIFFANY,
State Reporter.