# IN THE SUPREME COURT OF TEXAS

═════════
No. 18-0660
═════════

IN RE OCCIDENTAL CHEMICAL CORPORATION,
OXY INGLESIDE ENERGY CENTER, LLC,
OXY INGLESIDE LPG TERMINAL LLC, AND
OXY INGLESIDE OIL TERMINAL LLC, RELATORS

═══════════════════════════════
ON PETITION FOR WRIT OF MANDAMUS
═══════════════════════════════

**Argued September 10, 2018**

CHIEF JUSTICE HECHT delivered the opinion of the Court in which JUSTICE GREEN, JUSTICE JOHNSON, JUSTICE LEHRMANN, JUSTICE DEVINE, and JUSTICE BROWN joined.

JUSTICE BROWN filed a concurring opinion, in which JUSTICE BOYD and JUSTICE BLACKLOCK joined in part.

JUSTICE BOYD filed a dissenting opinion, in which JUSTICE BLACKLOCK joined.

JUSTICE GUZMAN did not participate in the decision.

The Texas Constitution requires that all property be taxed "in the county where situated".[1]

But for 46 years, Nueces County and San Patricio County have been locked in a Texas Death Match[2]

---

[1] TEX. CONST. art. VIII, § 11 ("All property, whether owned by persons or corporations shall be assessed for taxation, and the taxes paid in the county where situated".).

[2] "The Last Man Standing match is a hardcore-style match where the only way to win is by knockout. That is, a wrestler will lose the match if they are unable to answer a ten-count after being downed, similar to the knockout ruling of a boxing match. To avoid losing, the downed wrestler must be on their feet by the count of 10, but they can't lose by leaving the ring for 10-count (ring out) if he is still on his feet while recovering. A similar type of match is the Texas Death match (aka. Mexican Death Match), where a wrestler must be pinned or forced to submit before the referee will begin the ten-count." *See Professional wrestling match types*, WIKIPEDIA, https://en.wikipedia.org/wiki/Professional_

over their shoreline boundary on Corpus Christi Bay, and for the past 10 years both have taxed the same piers, docks, and other facilities affixed to the land—San Patricio County—but extending out into the water—Nueces County. Taxpayers have paid millions of dollars in taxes on the same property to each county. Barred by immunity from suing the counties, taxpayers' only remedy has been to file tax protest suits year after year against each county to preserve their right to a refund whenever it is determined which county lacked the authority to assess the taxes.

Not surprisingly, the Legislature and Governor have concluded that the taxpayers' plight is intolerable. After all, "for at least 125 years, we have assumed and sometimes held that double taxation is forbidden."[3] Last year, the Legislature enacted, and the Governor signed into law, a statute authorizing property owners subject to the multiple taxation to petition this Court directly to determine which county is owed the taxes.[4] In this proceeding under that statute, we hold that we have original jurisdiction and that taxes on relators' property are owed to San Patricio County.

## I

### A

Relators (collectively, "Oxy"[5]) own two massive commercial piers extending from the mainland of San Patricio County into the waters of Corpus Christi Bay that lie in Nueces County.

---

wrestling_match_types (last visited Oct. 9, 2018).

[3] *TracFone Wireless, Inc. v. Comm'n on State Emergency Commc'ns*, 397 S.W.3d 173, 179 (Tex. 2013).

[4] Act of May 26, 2017, 85th Leg., R.S., ch. 768, § 1, 2017 Tex. Gen. Laws ___ (codified at TEX. LOC. GOV'T CODE § 72.010).

[5] Relators are Occidental Chemical Corporation; Oxy Ingleside Energy Center, LLC; Oxy Ingleside LPG Terminal LLC; and Oxy Ingleside Oil Terminal LLC.

2

Alpha Pier, some 1,100 feet long and 80 feet wide, extends into the Corpus Christi Channel of the Bay. It was constructed by the Army Corps of Engineers and operated by the United States Navy until 2010. Oxy acquired Alpha Pier and its docks in 2012. Beta Pier is approximately 500 feet long and extends into the La Quinta Channel of the Bay. At its end, a perpendicular walkway extends 550 feet in each direction. Oxy constructed Beta Pier around 1990 and continues to own and operate it. Both Piers, anchored by concrete piles deeply embedded in the floor of the Bay, are permanent, immovable structures. The Piers and the equipment on them are used to load crude oil and industrial chemicals onto large, international tankers. Aerial photographs of the Piers are included in the Appendix to this opinion.

San Patricio County and Nueces County have each assessed taxes on Oxy's Piers, and Oxy has paid taxes to both, though it has done so under protest in order to preserve its contention that it has been double-taxed and obtain a refund. In 2009, San Patricio County sued Nueces County in the district court in Refugio County to determine which of them has authority to tax property affixed to the land but extending out into the water.[6] That suit remains pending. Oxy petitions this Court to resolve in this original proceeding the counties' dispute in their pending litigation. Oxy does not take sides in that dispute, urging only that it be freed from double taxation. Nueces County contends that the Court lacks jurisdiction over this proceeding.

This is but the latest chapter in these counties' 46-year history of boundary litigation. To provide the context for the arguments before us, we briefly survey that history.

---

[6] *San Patricio County v. Nueces County*, No. 4704 (135th Judicial Dist., Refugio Cty., Tex., filed Nov. 23, 2009).

**B**

Counties are creatures of the Legislature.[7] In the early days of Texas' statehood, the Legislature frequently redefined county boundaries and created new boundaries as Texas grew and changed. The 1846 boundary between San Patricio County and Nueces County was described as "following the meanders" of Corpus Christi Bay.[8] Boundary disputes can arise between counties, especially over boundaries defined in reference to a body of water, which can be dynamic and difficult to ascertain. In 1897, the Legislature authorized counties to sue each other "for the purpose of establishing the boundary line between them."[9] That statute, now codified as Section 72.009 of the Local Government Code, provides that suit must be brought in the district court of the closest, adjoining county "whose boundaries are not affected by the suit".[10] "The district court has jurisdiction to determine where the boundary line is located and may order the line to be re-marked and resurveyed."[11] "The line established by the district court shall be treated as the true boundary between the counties unless the court determines that the line in question was established under prior law."[12]

---

[7] TEX. CONST. art. IX, § 1 ("The Legislature shall have power to create counties for the convenience of the people".); *see id.* art. VII, § 34 (1845) ("The legislature shall, at the first session thereof, and may at any subsequent session, establish new counties for the convenience of the inhabitants of such new county or counties".).

[8] Act approved April 18, 1846, 1st Leg., R.S., § 1, 1846 Tex. Gen. Laws 86, *reprinted in* 2 H.P.N. Gammel, *The Laws of Texas 1822-1897*, at 1392, 1392 (Austin, Gammel Book Co. 1898).

[9] Act approved May 21, 1897, 25th Leg., R.S., ch. 158, § 1, 1897 Tex. Gen. Laws 222, 223, *reprinted in* 10 H.P.N. Gammel, *The Laws of Texas 1822-1897*, at 1276, 1277 (Austin, Gammel Book Co. 1898).

[10] TEX. LOC. GOV'T CODE § 72.009(a).

[11] *Id.* § 72.009(b).

[12] *Id.*

In 1972, San Patricio County sued Nueces County in the district court of neighboring Refugio County "to determine the boundary between the two counties running along the Nueces River, and the Nueces, Corpus Christi, and Redfish Bays, and to recover taxes which it claimed that Nueces County wrongfully assessed on the San Patricio County side of the boundary."[13] The counties disputed whether statutes then delineating their boundaries set the dividing line in the center of those waterways, as San Patricio County argued, or at the shoreline, as Nueces County argued.[14] The case remained pending for 17 years. Finally, in 1989, the trial court granted summary judgment for Nueces County.[15] The court of appeals reversed because the judgment failed to dispose of San Patricio County's claim that the shoreline had moved or been modified by natural processes, such as erosion, or by human intervention, such as dredging.[16] The court remanded the case "for trial of the issue of which county includes the modifications in question within its boundaries."[17] The "modifications in question" did not include piers, docks, and other facilities, as the counties had never specifically contested the authority to tax them.

Fourteen years later, in 2003, the trial court rendered a final judgment. The court "decreed that the common boundary line between San Patricio and Nueces Counties" runs "along the northerly shoreline[] of . . . Corpus Christi Bay" and that "San Patricio County shall lie northerly

_____

[13] *San Patricio County v. Nueces County*, No. 13-89-278-CV, slip op. at 1 (Tex. App.—Corpus Christi Sept. 6, 1990) (not designated for publication).

[14] *Id.* at 1–2.

[15] *See id.* at 2.

[16] *See id.* at 5–6.

[17] *Id.* at 6.

5

of that line" and "Nueces County shall lie southerly of that line". The judgment defines "shoreline" as "the point at which the waters of the bays meet the mainland at mean lower low tide." On the remanded issue, the judgment declares: "Past and future natural and artificial modifications to the shoreline of San Patricio County shall form a part of San Patricio County." Post-judgment litigation continued until 2008 but did not result in any change to the judgment.[18]

In 2009, San Patricio County filed a new Section 72.009 suit in Refugio County district court to enjoin Nueces County from taxing certain properties, including Oxy's Beta Pier, that were built in San Patricio County but extend into the water in Nueces County. San Patricio County claimed the properties were on its side of the boundary under the 2003 judgment.[19] On Nueces County's motion, venue was transferred to Nueces County,[20] where the case sat inactive for years while San Patricio County pursued mandamus relief, ultimately unsuccessfully.[21] In 2014, the district court granted summary judgment for Nueces County, dismissing all of San Patricio County's claims.[22] The court of appeals reversed, concluding that under Section 72.009, the case should be heard in Refugio

---

[18] *See generally Nueces County v. San Patricio County*, 246 S.W.3d 351 (Tex. 2008) (per curiam).

[19] *San Patricio County v. Nueces County*, 492 S.W.3d 476, 479 (Tex. App.—Corpus Christi 2016, pet. denied).

[20] *Id.* at 481; *see* TEX. CIV. PRAC. & REM. CODE § 15.015 ("An action against a county shall be brought in that county."); *id.* § 65.023(a) (providing that a writ of injunction against a Texas resident defendant "shall be tried . . . in the county in which the party is domiciled").

[21] *San Patricio County*, 492 S.W.3d at 481.

[22] *Id.* at 482.

County after all.[23] This Court denied review.[24] The court of appeals' mandate issued in October 2017.

The case again lay dormant for about eight months. In June 2018, the counties' counsel wrote jointly to the Refugio County district court requesting a status conference to discuss pending summary judgment motions. Their letter states: "The parties have agreed, subject to your approval, that the pivotal/dispositive issue to be decided is a legal question." The parties represent in their briefs to this Court that a summary judgment hearing is set for later this month.

## C

Since at least 2008, both San Patricio County and Nueces County, and taxing units within the counties, have been assessing ad valorem taxes[25] on the Piers.[26] To protect its right to an eventual refund, Oxy has paid tax bills under protest and pursued administrative and legal remedies.[27] Pending suits against each county await a determination by a court with jurisdiction over both counties whether the Piers are located in one or the other. Other taxpayers are in the same predicament.[28]

---

[23] *Id.* at 488.

[24] 60 Tex. Sup. Ct. J. 1231 (June 16, 2017).

[25] An "'ad valorem' tax[] is a tax on property at a certain rate based on the property's value." *Willacy Cty. Appraisal Dist. v. Sebastian Cotton & Grain, Ltd.*, __ S.W.3d __ (Tex. Apr. 27, 2018).

[26] Oxy asserts that it has paid double taxes on the Piers since 2008, but it did not acquire the Alpha Pier until 2012. We need not ferret out the timeline. The breakdown of what taxes Oxy paid on which Pier in which year is not necessary to our decision.

[27] *See* TEX. TAX CODE ch. 41–42.

[28] *See* Br. of Amicus Curiae Corpus Christi Liquefaction, LLC at v (asserting that it "has been subject to duplicate taxation by taxing units in both counties for years").

In 2017, the Legislature intervened, enacting Section 72.010, a bracket bill affecting only the dispute between San Patricio and Nueces Counties.[29] The statute provides:

> (c)     If, as a result of disputed, overlapping, or erroneously applied geographic boundaries between like taxing units, multiple like taxing units have imposed ad valorem taxes on the same property, the property owner may file suit in the supreme court to:
>
>     (1)     establish the correct geographic boundary between the taxing units; and
>
>     (2)     determine the amount of taxes owed on the property and the taxing unit or units to which the taxes are owed.
>
> (d)     The supreme court has original jurisdiction to hear and determine a suit filed under Subsection (c) and may issue injunctive or declaratory relief in connection with the suit.[30]

The statute directs the Court to "enter a final order . . . not later than the 90th day after the date the suit is filed."[31] At the same time, the Legislature amended the Tax Code to require the chief

---

[29] *See* TEX. LOC. GOV'T CODE § 72.010(b) ("This section applies only to: (1) a county that has a population of less than 400,000 and contains a municipality with a population of at least 300,000; (2) a county that has a population of at least 50,000 and is adjacent to a county described by Subdivision (1); and (3) a taxing unit other than a county that has territory in a county described by Subdivision (1) or (2)."); *see also* Senate Fin. Comm., Bill Analysis, Tex. S.B. 2242, 85th Leg., R.S. (2017) ("S.B. 2242 solves a local problem specific to San Patricio and Nueces Counties in South Texas."). To avoid the constitutional prohibition against local or special laws, TEX. CONST. art. III, § 56(a), the Legislature uses population to limit a statute's applicability to certain areas. "[I]t has long been held that the use of population brackets alone to direct legislation toward a particular county needing a particular type of legislation will not in itself save the law from being unconstitutional as a special law if the classification bears no reasonable relationship to the objects sought to be accomplished." *Smith v. Decker*, 312 S.W.2d 632, 635–636 (Tex. 1958). No challenge to Section 72.010 as an unconstitutional special law has been raised in this proceeding.

[30] TEX. LOC. GOV'T CODE § 72.010(c)–(d).

[31] *Id.* § 72.010(e).

appraiser of an appraisal district affected by the Court's order to correct its rolls and records "as necessary to reflect the . . . order" within 45 days of its issuance.[32]

Invoking Section 72.010, Oxy filed an original petition for a writ of mandamus in this Court on July 19, 2018, naming Nueces County and San Patricio County as real parties in interest. The petition names as respondents each county's chief tax appraisers and assessors and the state Commissioner of the General Land Office ("the GLO"). Oxy prays that the Court determine which county is authorized to tax the Piers and to order the other and its taxing authorities to remove the Piers from their tax rolls and refund improperly collected taxes. Oxy takes no position on which county should prevail. Oxy argues that the amount of taxes to be refunded must be determined in the pending taxpayer suits after this Court renders judgment.

We expedited briefing and oral argument.

## II

San Patricio County and the GLO agree that the Court has jurisdiction over Oxy's petition under Section 72.010. Nueces County challenges the Court's jurisdiction and the constitutionality of Section 72.010.[33]

---

[32] TEX. TAX CODE § 25.25(p). The Legislature also added Section 31.112, providing in part that "[i]f a dispute or error described by Section 72.010(c), Local Government Code, is not resolved by the agreement of the taxing units and the supreme court enters a final order in a suit under Section 72.010, Local Government Code, determining the amount of taxes owed on the property and the taxing unit or units to which the taxes are owed, a refund required as a result of the order must be made not later than the 180th day after the date the order is entered." *Id.* § 31.112(e).

[33] Nueces County does not argue that Section 72.010 does not waive its sovereign immunity at least to the extent of the relief authorized. The authorization of suit against it is a clear waiver of immunity.

**A**

This Court's original jurisdiction is derived solely from Article V, Section 3(a) of the Texas Constitution, which provides that "[t]he Legislature may confer original jurisdiction on the Supreme Court to issue writs of quo warranto and mandamus in such cases as may be specified, except as against the Governor of the State."[34] The provision expressly imposes two limits on the Legislature's authority: a grant of original jurisdiction must be to issue writs of quo warranto and mandamus, and those writs cannot issue against the Governor. Inherent in the constitutional provision are three other "limitations on the power of the Legislature to specify classes of cases which may be brought within the court's original jurisdiction", as we explained in our 1930 decision in *Love v. Wilcox*:

> One is that the right to the duty required to be performed by mandamus shall not be 'dependent upon the determination of any doubtful question of fact.' Another limitation is that the writ of quo warranto or mandamus be a proper or necessary process for enforcement of the right asserted. A third is there must be some strong and special reason for the exercise of this extraordinary original jurisdiction by a court designed primarily as the court for the correction by appellate review of errors of inferior courts in determining questions of law.[35]

The "strong and special reason" test is satisfied, we said, "where the proceeding 'involves questions which are of general public interest and call for a speedy determination.'"[36] "[T]he remedy of mandamus must be pursued in the lower courts unless it is made plain that urgent necessity calls for the exercise of the original jurisdiction of the Supreme Court."[37] We concluded in *Love* that the

---

[34] TEX. CONST. art. V, § 3(a).

[35] *Love v. Wilcox*, 28 S.W.2d 515, 519 (Tex. 1930) (orig. proceeding) (citations omitted).

[36] *Id.* (quoting *Betts v. Johnson*, 73 S.W. 4, 5 (Tex. 1903) (orig. proceeding)).

[37] *Id.* at 521.

10

Legislature had not exceeded its authority in conferring original jurisdiction on this Court to issue mandamus compelling officials of political parties to perform their duties under the law.[38]

We revisited *Love* in 2011, in *In re Allcat Claims Service, L.P.*[39] That case involved expansions of the state's franchise tax the Legislature had enacted to fund public education ("the Act").[40] "For the first time limited partnerships and certain other unincorporated associations were required to pay the tax."[41] The Texas Constitution provides that any law "impos[ing] a tax on the net incomes of natural persons, including a person's share of partnership and unincorporated association income," cannot take effect until approved by voters in a statewide referendum.[42] Anticipating that this provision might be used to challenge the Act as imposing an income tax without voter approval on individuals owning limited partnerships and unincorporated associations newly subject to the franchise tax, the Legislature included a grant of original jurisdiction to this Court and a 120-deadline to rule:

> (a)     The supreme court has exclusive and original jurisdiction over a challenge to the constitutionality of this Act or any part of this Act and may issue injunctive or declaratory relief in connection with the challenge.
>
> (b)     The supreme court shall rule on a challenge filed under this section on or before the 120th day after the date the challenge is filed.[43]

---

[38] *See id.* at 521–522.

[39] 356 S.W.3d 455 (Tex. 2011) (orig. proceeding).

[40] *Id.* at 459.

[41] *Id.*

[42] *Id.* at 457 (quoting TEX. CONST. art. VIII, § 24(a)).

[43] Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 24, 2006 Tex. Gen. Laws 1, 40.

11

Allcat Claims Service, a limited partnership, filed an original petition for mandamus in this Court, naming the state Comptroller of Public Accounts as the respondent. Allcat argued that the amendments were unconstitutional both facially and as applied by the Comptroller in interpreting and enforcing the law.[44] It sought a declaration that the Act is unconstitutional, an order directing the Comptroller to refund franchise taxes that Allcat had paid under protest and that were traceable to its natural-person partners' shares of Allcat's income, and an injunction against the Comptroller from continuing to enforce the law against Allcat.[45]

Though the Comptroller did not contest our jurisdiction,[46] we addressed the issue at the outset. The authority to issue mandamus, though not mentioned in the legislative grant, was implied, we said, because "[t]he Act clearly expresses legislative intent that the Court consider the constitutionality of its provisions", and "mandamus is a 'proper or necessary process for enforcement of the right asserted' because Allcat seeks an order directing the Comptroller to refund part of the taxes it paid."[47] And while in *Lane v. Ross* we had held that "this court has no original jurisdiction to issue a writ of injunction", citing Article V, Section 3(a), we had also held that "[i]n cases in which this court's jurisdiction to issue a writ of mandamus has attached the court necessarily has the correlative authority to issue a writ of injunction to make the writ of mandamus

---

[44] *Allcat*, 356 S.W.3d at 459.

[45] *Id.*

[46] *Id.* at 460.

[47] *Id.* at 462 (quoting *Love v. Wilcox*, 28 S.W.2d 515, 519 (Tex. 1930) (orig. proceeding)).

effective."[48] "The same," we added in *Allcat*, "may be said of declaratory relief."[49] Thus, we concluded, the Act conferred on the Court original jurisdiction to issue the writ of mandamus together with "the correlative authority to provide declaratory and injunctive relief as appropriate."[50] And "[i]f the grant of jurisdiction or the relief authorized by the statute exceeds the limits of Article V, Section 3(a), then we simply exercise as much jurisdiction over the case as the Constitution allows, as we did in *Love*."[51] Thus, we concluded, the Act's grant of original jurisdiction to this Court "does not violate Article V, Section 3(a); and it gives this Court original, exclusive jurisdiction to consider the facial challenge to the Act's constitutionality to determine whether mandamus should issue directing the Comptroller to refund taxes that Allcat paid under protest."[52] But, we added, we lacked jurisdiction over Allcat's as-applied challenge because the Act did "not authorize th[e] Court to exercise original jurisdiction over challenges to how the Comptroller assesses, enforces, or collects the franchise tax."[53]

**B**

Oxy argues that this case, like *Allcat*, involves a challenge to the legality of taxation, a statutory grant of original jurisdiction that expressly authorizes injunctive and declaratory relief

---

[48] 249 S.W.2d 591, 593 (Tex. 1952) (orig. proceeding).

[49] *Allcat*, 356 S.W.2d at 462.

[50] *Id.*

[51] *Id.*

[52] *Id.* at 463.

[53] *Id.* at 470–471.

without mentioning mandamus, and an assertion that a government official abused his discretion by collecting a tax illegally. San Patricio County and the GLO agree. Nueces County alone challenges our jurisdiction over the case. It argues that Section 72.010 violates each of the three jurisdictional limitations we announced in *Love*.

1

Nueces County first argues that the Court lacks jurisdiction because Section 72.010 requires the Court to make fact findings, which, we said in *Love*, we cannot do.[54] Importantly, Nueces County does *not* argue that fact issues must be resolved before its boundary dispute with San Patricio County can be resolved. As we have already noted, both counties have represented to the district court in Refugio County that "the pivotal/dispositive issue to be decided is a legal question." Rather, Nueces County argues that even though this Court, like the district court, can resolve the dispute as a matter of law, Section 72.010 still requires the Court to make fact findings in the process.

Subsection (c) authorizes a property owner to file suit in this Court to establish boundaries and determine taxes owed. It plainly does not require the Court to do either one if fact issues are involved. In an oral argument exhibit, Nueces County has listed seven other fact issues that the Court must decide before granting Oxy any relief.[55] But as it has told the district court, none is

---

[54] *See Love v. Wilcox*, 28 S.W.2d 515, 519 (Tex. 1930) (orig. proceeding) ("One [limitation on our original jurisdiction] is that the right to the duty required to be performed by mandamus shall not be 'dependent upon the determination of any doubtful question of fact.'" (quoting *Teat v. McGaughey*, 22 S.W. 302, 303 (Tex. 1893) (orig. proceeding))).

[55] Nueces County lists these fact issues: (1) whether the Piers are located in the intervening waters between the mainland and those portions of three islands separated from the mainland by dredging; (2) whether field notes are necessary to locate the boundary; (3) whether the boundary really is the shoreline at the point of the mean lower low tide as stated in the 2003 judgment; (4) whether that judgment covers this dispute; (5) whether establishing the boundary is fundamentally factual and not an interpretation of the 2003 judgment; (6) what other properties are affected; and (7) whether taxes on the Piers must be allocated between the counties. Of these, (2), (3), (4), (5), and (7) are matters of law,

14

involved in resolving the dispositive legal question in the counties' dispute. Oxy acknowledges that there may be fact issues regarding how much tax is owed, which await adjudication in the tax protest cases. It does not ask this Court to resolve those issues, and they do not preclude us from deciding to which county taxes are owed. Even if there were other such fact issues that could be resolved, then as we said in *Allcat*, "we simply exercise as much jurisdiction over the case as the Constitution allows".[56]

Determining the counties' legal authority to tax Oxy's Piers is not, in *Love*'s words, "dependent upon the determination of any doubtful question of fact."

**2**

*Love*'s second limitation on a legislative grant of original jurisdiction is that mandamus must be "a proper or necessary process for enforcement of the right asserted".[57] *Allcat* held that mandamus is a proper or necessary process for determining the constitutionality of the franchise tax and prohibiting its collection. Nueces County argues that *Allcat* is distinguishable because this case does not involve a constitutional challenge, but the distinction is one without a difference. In both cases, the authority to tax, and the right to be free of the tax, depend on the validity of the assessment. At bottom, Oxy's petition is based on the constitutional requirement that property be taxed only in the county in which it is located.[58] In this case as in *Allcat*, the right to mandamus relief is predicated

and (1) and (6) are irrelevant.

[56] *Allcat*, 356 S.W.3d at 462.

[57] *Love*, 28 S.W.2d at 519 (citing *Pickle v. McCall*, 24 S.W. 265, 266 (Tex. 1893) (orig. proceeding)).

[58] TEX. CONST. art. VIII, § 11.

on the resolution of a legal question. Nueces County also argues that mandamus is precluded because Section 72.010 does not expressly authorize it, but in *Allcat* we rejected that very argument made against the grant of original jurisdiction there.[59]

The dissent concedes that one of the counties is "incorrect[ly]" taxing Oxy but is "not convinced that the counties' refusal to refund the taxes pending a resolution of the dispute is either an abuse of discretion or a violation of a ministerial legal duty."[60] In other words, in the dissent's view, counties have the discretion to double tax taxpayers.[61] We disagree. Either Nueces County or San Patricio County has persisted, for 10 years, in taxing property without the power to do so, knowing that the same property was also being taxed by the other county, leaving taxpayers no remedy but to pay under protest and wait. We view that conduct by the government as an abuse of discretion.

Nueces County argues that the tax protest suits Oxy has filed are an adequate remedy, but none of them can determine to which county Oxy owes its taxes. Oxy's remedy is to wait 46 years, or even 10 years, for counties to obtain a judgment that one of them must refund taxes, a result neither has shown a pressing interest in achieving. That is not an adequate remedy, in any sense of the word, for double taxation.

---

[59] *See Allcat*, 356 S.W.3d at 462.

[60] *Post* at ___ n.4.

[61] *Post* at ___ n.4. The dissent rationalizes: "Although Oxy and other taxpayers may be double-taxed, the Court misconceives the issue because neither of the counties is double-taxing them." *Post* at ___ n.4. We think the existence of double taxation should be viewed from the taxpayer's perspective.

16

We must note that the district court's jurisdiction in a Section 72.009 action to determine which county is authorized to tax Oxy's property is not entirely clear. Section 72.009 authorizes one county to sue another "to establish the common boundary line"[62] and provides that "[t]he district court has jurisdiction to determine where the boundary line is located".[63] Nueces County and San Patricio County agree that their 2003 judgment establishes their boundary as the shoreline. There is no question that Oxy's Piers are affixed to the land in San Patricio County and extend beyond, and above, the shoreline across the water in Nueces County. The locations of the boundary and Piers are not disputed. Determining which county can tax them depends on the effect of the boundary. We need not decide the extent of the district court's jurisdiction, having concluded that the proceeding there is not an adequate remedy for Oxy in any event, but the uncertainty regarding the relief that court can provide is further reason to consider the proceeding inadequate for Oxy.

Not only is the mandamus relief afforded by Section 72.010 proper, it is necessary in that it is the only reasonably effective relief Oxy and other taxpayers along the Nueces County–San Patricio County border have, or have ever had.

**3**

*Love*'s third limitation is that there be a "strong and special reason for the exercise of . . . extraordinary original jurisdiction" to resolve "questions which are of general public interest and call for a speedy determination".[64] Nueces County argues that delay cannot be a sufficient

---

[62] TEX. LOC. GOV'T CODE § 72.009(a).

[63] *Id.* § 72.009(b).

[64] *Love v. Wilcox*, 28 S.W.2d 515, 519 (Tex. 1930) (orig. proceeding) (quoting *Betts v. Johnson*, 73 S.W. 4, 5 (Tex. 1903) (orig. proceeding)).

reason because recent progress—in the past three months—in the Refugio County district court obviates the need for extraordinary mandamus relief, and in any event, the issue is of interest only to two counties and a handful of taxpayers, not the general public.

Nueces County's profession of an interest in expediting proceedings in the district court comes years too late. Actions speak louder than words. From 1972 to 2003, the counties exhibited no urgency whatsoever in resolving their boundary dispute. Their conduct since 2008, when the double taxation began, has been little different. The dissent dismisses the delay as "unfortunate" and "mostly irrelevant to the issue of whether a 'strong and special reason' existed for the legislature to authorize an original action in this Court."[65] The delay, the dissent notes, is merely the result of the counties' and courts' "follow[ing] proper trial and appellate procedure" throughout the history of the case.[66] But even assuming that litigating a dispute for 46 years could be characterized as "proper trial and appellate procedure", the Legislature could well have determined that the protracted delay, at a constant and mounting burden to taxpayers, is a "strong and special reason" to confer original jurisdiction in this Court to resolve the matter.

The dissent argues that Oxy "must first pursue that relief 'in the lower courts'" and "must pursue its rights in the ordinary fashion".[67] But Oxy is not a party to that action and cannot be. Section 72.009, the basis for the action, only allows counties to sue each other.[68] Oxy has no relief

---

[65] *Post* at ___.

[66] *Post* at ___.

[67] *Post* at ___.

[68] TEX. LOC. GOV'T CODE § 72.009(a).

18

to pursue there, in an ordinary fashion or any other way. The counties can pursue relief against each other, but that relief is theirs, not Oxy's.

In any event, we think the blatant double taxation of the property involved here is alone a "strong and special reason" for extraordinary mandamus relief. We have not found another instance of such conduct in the State's history. The counties might have avoided the burden to their taxpayers by agreeing that one would assess taxes and the two would split them until their dispute was resolved. Presumably, the taxpayers would not have protested. They might have done this at any time, and since last year, Section 31.112(c) of the Tax Code, added with Section 72.010, expressly authorizes Nueces County and San Patricio County to resolve their dispute by agreement.[69] As it is, without the mandamus relief afforded by Section 72.010, Oxy and other taxpayers would have no choice but to continue paying millions of dollars in taxes on the same property to both counties.[70]

Unquestionably, less is at stake here than in *Allcat*. There, the validity of the franchise tax affected taxpayers throughout the State and the entire public fisc. The tax issue now before us involves only a few taxpayers and a small fraction of the revenue, though Oxy argues it will affect commercial activity in the Corpus Christi Bay area. Nevertheless, we think unprecedented double taxation by counties for so prolonged a time, involving significant sums, and with the counties'

---

[69] Act of May 26, 2017, 85th Leg., R.S., ch. 768, § 3, 2017 Tex. Gen. Laws ___ (codified at TEX. TAX CODE § 31.112).

[70] Oxy represents that between 2008 and 2017, it paid more than $6 million in ad valorem taxes for the Piers to Nueces County and San Patricio County and their related taxing units collectively, and that approximately half of that sum represents duplicate payments. In its amicus curiae brief, Corpus Christi Liquefaction, LLC represents that it is constructing a natural gas liquefaction and export facility on the northern shoreline of the Bay and that the facility, though not yet complete, already provides a significant source of employment and economic activity in the Corpus Christi region. Its 2018 tax bills from Nueces County and San Patricio County total more than $3 million—an 81% increase over the aggregate amount of its 2017 bills.

unable to resolve their dispute, raises an issue "of general public interest" that "call[s] for a speedy determination."[71] The matter is for this Court to decide, but the Legislature and Governor, too, are charged with an awareness of the *Love* factors. Section 72.010 passed the Senate unanimously,[72] passed the 150-member House with but one dissenting vote,[73] and was signed by the Governor.[74] Our assessment of the importance of the relief afforded is consistent with that of the people's representatives.

The dissent dismisses the seriousness of the taxpayers' situation. The legislative consensus in enacting Section 72.010 was merely "well-intentioned",[75] the predicament of Oxy and other taxpayers is "sympathetic" but not compelling, and the years-long delays are simply "unfortunate",[76] but *Allcat*'s reasoning was "more creative than convincing" and its result doubtful,[77] double taxation may not even be an abuse of discretion,[78] and Oxy should somehow "pursue . . . relief 'in the lower

---

[71] *Love v. Wilcox*, 28 S.W.2d 515, 519 (Tex. 1930) (orig. proceeding) (quoting *Betts v. Johnson*, 73 S.W. 4, 5 (Tex. 1903) (orig. proceeding)).

[72] S.J. of Tex., 85th Leg., R.S. 3553 (2017) (vote on SB 2242 with House amendment).

[73] H.J. of Tex., 85th Leg., R.S. 3789 (2017) (vote on SB 2242).

[74] S.J. of Tex., 85th Leg., R.S. 4245 (2017) (SB 2242 signed on June 12, 2017).

[75] *Post* at ___.

[76] *Post* at ___.

[77] *Post* at ___.

[78] *Post* at ___ n.4.

20

courts'" that is available only to the counties,[79] and "pursue its rights in the ordinary fashion" that does not exist.[80] We disagree.

## C

By constitutional design, this Court's primary role is to sit as the court of *last* resort in civil cases[81] that "present[] . . . question[s] of law that [are] important to the jurisprudence of the state."[82] If we are to fulfill our constitutional duties to act as the final arbiter in the most important civil cases and to decide those cases with expediency, our original jurisdiction must remain limited.

Original jurisdiction of disputes like this one is a significant burden on the judicial system. For every case the Court hears, another case equally worthy of review must be turned down. Those costs are compounded here by the mandate in Section 72.010(e) that the Court "enter a final order determining" the complex issues raised by the parties in 90 days.[83] The deadline has required that this case be given immediate and expedited attention. Nueces County challenges the deadline as an intrusion in the operation of the judiciary in violation of the separation of powers. We need not

---

[79] *Post* at ___.

[80] *Post* at ___.

[81] *See* TEX. CONST. art. V, § 3(a); *In re Reece*, 341 S.W.3d 360, 371 (Tex. 2011) (orig. proceeding) ("[T]his Court is the court of final review for civil matters").

[82] TEX. GOV'T CODE § 22.001(a).

[83] TEX. LOC. GOV'T CODE § 72.010(e). Relying heavily on the dissenting opinion in *Allcat*, Nueces County argues that the deadline violates the separation of powers. *See* TEX. CONST. art. II, § 1; *In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 485–493 (Tex. 2011) (orig. proceeding) (Willett, J., dissenting). We again decline to decide the issue. Even if the deadline were unconstitutional, it would not affect our jurisdiction. *See Allcat*, 356 S.W.3d at 462 (explaining that where part of a jurisdictional grant is unconstitutional, "we simply exercise as much jurisdiction over the case as the Constitution allows"); *id.* at 473–474 (responding to the dissenting opinion's suggestion that the statutory 120-day deadline for the Court's ruling in that case was unconstitutional).

21

address that challenge because the case has been decided within the time frame contemplated by the statute. But as we noted in *Allcat*, the challenge is a serious one.[84]

In the end, a dispute between counties for nearly half a century now burdens taxpayers with double assessments and multiplying protest litigation. Not only is the end not in sight, the counties' commitment to a timely resolution is not apparent. Consistent with *Love* and *Allcat*, we conclude that this unique case presents a compelling reason for us to exercise original jurisdiction.

### III

Nueces County also contends that Section 72.010 violates the Texas Constitution's prohibition against retroactive laws, which states: "No bill of attainder, ex post facto law, retroactive law, or any law impairing the obligation of contracts, shall be made."[85] Nueces County argues that Section 72.010 "impairs a vested right" belonging to it, namely, the right to continue litigating in the Refugio County district court. Nueces County also contends that Section 72.010 overturns prior judgments entered over the course of the litigation.

In *Robinson v. Crown Cork & Seal Co.*,[86] after an extensive analysis of our prior decisions and federal jurisprudence on retroactivity, we expressly rejected the vested-rights test, explaining that "[w]hat constitutes an impairment of vested rights is too much in the eye of the beholder to serve as a test for unconstitutional retroactivity."[87] We reasoned that "[n]o bright-line test . . . [was]

---

[84] *See Allcat*, 356 S.W.3d at 473 ("The separation of powers issue is neither subtle nor unimportant.").

[85] TEX. CONST. art. I, § 16.

[86] 335 S.W.3d 126 (Tex. 2010).

[87] *Id.* at 143.

22

possible" and announced that courts should instead assess three factors: "the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings; the nature of the prior right impaired by the statute; and the extent of the impairment."[88] Importantly, we also clarified that "[u]nder this test, changes in the law that merely affect remedies or procedure, or that otherwise have little impact on prior rights, are usually not unconstitutionally retroactive."[89]

Since *Robinson*, we have repeated that "applying procedural, remedial, or jurisdictional statutes retroactively does not violate the Constitution's prohibition on retroactive laws."[90] Our analysis in *University of Texas Southwestern Medical Center v. Estate of Arancibia* is particularly instructive here. That case involved an amendment to the presuit notice requirement in the Tort Claims Act that was enacted after the underlying medical malpractice case was filed.[91] The amendment expressly made the notice requirement jurisdictional—which affects the procedural path of a challenge to the plaintiff's having met the requirement—and one issue before us was whether the amendment applied in the underlying case.[92] We held that it did.[93]

Our analysis turned on the new law's status as a jurisdictional rule. "[A]pplication of a new jurisdictional rule generally takes away no substantive right but simply impacts a tribunal's power

---

[88] *Id.* at 145.

[89] *Id.* at 146.

[90] *City of Austin v. Whittington*, 384 S.W.3d 766, 790 (Tex. 2012); *see Oncor Elec. Delivery Co. v. Dall. Area Rapid Transit*, 369 S.W.3d 845, 851 (Tex. 2012); *Univ. of Tex. Sw. Med. Ctr. v. Estate of Arancibia*, 324 S.W.3d 544, 548 (Tex. 2010).

[91] *Estate of Arancibia*, 324 S.W.3d at 546–547.

[92] *Id.* at 546–548.

[93] *Id.* at 548.

to hear the case," we explained.[94] We noted that the "Supreme Court of the United States has 'regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed.'"[95] And we declared that "[s]tatutes . . . that do not deprive the parties of a substantive right and 'speak to the power of the court rather than to the rights or obligations of the parties' may be applied to cases pending at the time of enactment."[96]

The *Robinson* factors and Section 72.010's status as a jurisdictional statute defeat Nueces County's retroactivity challenge. We have identified the public interest served by the statute in concluding that there is a "strong and special reason" for us to exercise the jurisdiction conferred by the statute. Moreover, the only "right" that Nueces County identifies as having been impaired is its preference for continuing to litigate in Refugio County district court before any review by this Court takes place. Substituting review in this proceeding for later review on appeal is not unconstitutionally retroactive.

We also reject Nueces County's contention that Section 72.010 reverses any judgment previously rendered in the boundary litigation. To the contrary, as we now explain, the 2003 judgment's establishment of the counties' boundary as the shoreline, considered in light of the common law, determines which county may tax the Piers.

---

[94] *Id.*

[95] *Id.* (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 247 (1994)).

[96] *Id.* (quoting *Landgraf*, 511 U.S. at 274–275).

# IV

We come at last to the issue whether Nueces County or San Patricio County is owed the taxes due on Oxy's Piers.

As we have discussed, the 2003 judgment establishes the "shoreline" as "the point at which the waters of the bays meet the mainland at mean lower low tide" and provides that "[p]ast and future natural and artificial modifications to the shoreline of San Patricio County shall form a part of San Patricio County." San Patricio County argues that Oxy's Piers are "artificial modifications to the shoreline" within the meaning of the 2003 judgment. Nueces County counters that the litigation leading up to the judgment involved whether the location of the shoreline had been altered by dredging in the waterway, not by piers or other facilities. The mere fact that piers and other facilities were not part of the evidence and argument in the trial leading to the 2003 judgment does not preclude characterizing them as modifications. But we agree with Nueces County that piers, docks, and related facilities cannot fairly be said to alter a shoreline as dredging does. We also agree with Nueces County that private persons cannot alter county boundaries merely by constructing improvements across them. We do not think it reasonable to consider Oxy's Piers as spine-like extensions of San Patricio County's boundary. But all agree that the 2003 judgment's establishment of the shoreline as the counties' boundary is determinative, and so do we.

Taxation is justified by the assumption that the government will render services of equivalent value in protecting one's person and property, in adding to the value of one's property, and in creating and maintaining public conveniences in which one shares, like roads, bridges, sidewalks, pavements, and schools for the education of children. Nueces County cannot practically render

25

services such as fire and police protection to Oxy's Piers, while San Patricio County can easily access the Piers from the land. Nueces County can do little, if anything, to improve the value of Oxy's Piers, and nothing to provide public conveniences, as San Patricio County can.

Although no Texas court has ever addressed the issue of whether piers and similar facilities constructed along a shoreline that forms the boundary between two local jurisdictions should be treated a part of the land or part of the water, courts in other jurisdictions have done so.

In *Udall v. Trustees of Brooklyn*, the question was whether the Village of Brooklyn had jurisdiction to fine Udall for acting as a public measurer, without a license from the Village.[97] Udall argued that the Village had no jurisdiction over him because his business was located on a wharf constructed out from the shore and past the low-water mark and that the Village's jurisdiction was limited to the lands above the low-water mark.[98] The New York court rejected Udall's arguments, concluding that the boundary of Kings County, which was defined as the land above the low-water mark of the East River, included wharfs constructed out into the East River.[99] "We are of opinion that Kings County [in which the Village was located] includes all the wharves and made land on the Long Island shore of the East River, as well as natural alluvion, to the actual line of low water."[100] The New York Court of Appeals expressly approved this holding in *Orr v. City of Brooklyn*:

> The jurisdiction of the city of Brooklyn must, from necessity, follow the shore as it advances into the river or bay, whether the accretion proceeds from alluvion or

---

[97] 1821 WL 1598 (N.Y. Sup. Ct. 1821) (per curiam).

[98] *Id.*

[99] *Id.*

[100] *Id.*

26

artificial deposits and erections. This is asserted in *Udall v. Brooklyn* (19 Johns., 175). I concur in this decision. The wharves or piers are a part of the shore, and, as they were necessarily above the surface of the water, they were above the low water mark which gave jurisdiction.[101]

A similar result was reached by the Maryland Court of Appeals in determining the boundary between the City of Baltimore and County of Baltimore.[102] In that case, the question was whether piers that were constructed out into the Patapsco River from its northern shoreline were within the jurisdiction of the City of Baltimore, on the land side of the shoreline boundary, or Baltimore County, on the river side.[103] The court concluded that the piers should be treated as an extension of the shoreline rather than as a part of the river.[104] The court noted that riparian owners of the land along the shoreline had the right to construct docks and piers.[105] It rejected the idea that a rational legislature would ever have intended for the piers to be treated for taxation purposes as if they were "cut in two at the point of high-water mark".[106] The piers, the court reasoned, were useless except for their connection to the land, and were entirely dependent on the City of Baltimore for police and fire protection.

> It would seem, therefore, to be perfectly clear that the Legislature never intended that such improvements as these should, for the purposes of taxation, be cut in two at the point of high-water mark on the bank of the river when they were made, and part be

[101] 36 N.Y. 661, 664–665 (1867).

[102] *W. Md. Tidewater R.R. Co. v. City of Baltimore*, 68 A. 6 (Md. 1907).

[103] *Id.* at 7–8.

[104] *Id.* at 10.

[105] *Id.* at 9.

[106] *Id.* at 10.

taxed by the city and the rest by the county. Without the right to use the land, which is in Baltimore city, the improvements would be useless, and, as they are incident to that land and dependent upon it for their existence, it would be an anomalous condition of affairs if they were to be thus divided. They are so situated as to be dependent upon the city for police and fire protection, and if the appellant's theory be correct they would practically have neither, as this water is separated from Baltimore county and it would be impossible to furnish the appellant with proper fire or police protection on these piers, unless the county made special provision for them, which would practically be impossible without the assistance of the city.[107]

The same logic applies in construing the 2003 judgment in this case.

This result is consistent with the common law and statutory rights of littoral and riparian owners. The right to construct docks, piers, and similar facilities is subservient to the ownership of property abutting the natural shoreline.[108] "Littoral rights are appurtenant to the land which borders a lake or sea."[109] "Littoral rights, at common law, consist of the right of access to the water, the right to any accretions, and the right to build wharves, docks, and piers."[110] The right of a littoral owner to construct docks, piers, and similar facilities arises out of the ownership of the abutting shoreline, not the water. "These rights all pertain to the use of abutting land in connection with the water, or of the water in connection with the land. The right to use beyond the low-water mark rests upon the

---

[107] *Id.*

[108] Property that abuts a shoreline is generally denominated as either "littoral" or "riparian". *Black's Law Dictionary* defines the term "littoral" as "[o]f, relating to, or involving the coast or shore of an ocean, sea, or lake" and the term "riparian" as "[o]f, relating to, or located on the bank of a river or stream (or occasionally another body of water, such as a lake)". *Littoral*, *Riparian*, BLACK'S LAW DICTIONARY (10th ed. 2014).

[109] *City of Corpus Christi v. Davis*, 622 S.W.2d 640, 646 (Tex. App.—Austin 1981, writ ref'd n.r.e.).

[110] *Id.*; *accord Gibson v. Carroll*, 180 S.W. 630, 632 (Tex. Civ. App.—San Antonio 1915, no writ) (stating that the rights of an owner of riparian lots included "the right to build a wharf").

title to the bank, and not to the bed of the water."[111] "[T]he right to construct moles or piers; i.e. to wharf out, belong[s] to the owner of the adjacent land."[112]

The common law thus firmly recognizes that the right to construct docks, piers, and similar facilities from the shore into the water springs from the ownership of the upland property bordering the shore, rather than from the submerged lands on which portions of those facilities are constructed. The common law therefore supports treating docks, piers, and similar permanent facilities that are connected to the mainland of San Patricio County as a part of that county. The taxes owed by Oxy on its Piers are due San Patricio County, not Nueces County.

## V

Finally, Nueces County argues that even if its taxing authorities have assessed taxes against Oxy without authority to do so, mandamus relief is inappropriate because they have acted in reliance on valid statutes requiring the assessment of taxes. Taxing Oxy's Piers, if unauthorized, was a mistake, not an *ultra vires* act correctable by mandamus.

We rejected a similar argument in *Allcat*. There, the Comptroller contended that even if the franchise tax were unconstitutional, "mandamus relief [could] never be appropriate" because "an official does not abuse her discretion by enforcing a statute that is later determined to be

---

[111] *Richter v. Granite Mfg. Co.*, 174 S.W. 284, 286 (Tex. 1915) (quoting *Lake Superior Land Co. v. Emerson*, 38 N.W. 200 (Minn. 1888), *overruled on other grounds by Hanford v. St. Paul & D.R. Co.*, 44 N.W. 1144 (Minn. 1890)).

[112] *City of Galveston v. Menard*, 23 Tex. 349, 385 (1859); *see also United States v. River Rouge Improvement Co.*, 269 U.S. 411, 418 (1926) ("It is well settled that in the absence of a controlling local law otherwise limiting the rights of a riparian owner upon a navigable river, he . . . may construct landings, wharves or piers". (internal citation omitted)).

unconstitutional."[113] Our explanation was simple: "[I]f Allcat [were] correct and the Act [were] unconstitutional, then the Act [did] not provide legal authority for the Comptroller to retain the taxes and Allcat [would] be entitled to mandamus directing a refund."[114] By the same reasoning, if tax statutes do not provide Nueces County the legal authority to assess and retain taxes on Oxy's Piers, Oxy is entitled to mandamus relief.

## VI

Accordingly, we direct the Nueces County Appraisal District to withdraw and cease from issuing tax assessments to Oxy for its Piers and other facilities which we have held to be part of San Patricio County. We are confident the District will promptly comply. Our writs of mandamus and injunction will issue only if it does not.

Nathan L. Hecht
Chief Justice

Opinion delivered: October 12, 2018

---

[113] *In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 462 (Tex. 2011) (orig. proceeding).

[114] *Id.* But we went on to hold that Allcat was not correct because the franchise tax act was not unconstitutional on its face, and we denied relief. *Id.* at 470, 474. A year later, in a different case, we rejected additional challenges to the franchise tax under the Texas and United States Constitutions. *In re Nestle USA, Inc.*, 387 S.W.3d 610 (Tex. 2012) (orig. proceeding).



Alpha Pier

